UNITED STATES, Appellee

v.

DONALD J. BIESAK, Private First Class,
U. S. Marine Corps, Appellant

3 USCMA 714, 14 CMR 132

715.

716

LCDR John J. Nelson, USNR, for Appellant.
CDR Thomas E. Blade, USN, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Biesak, was convicted by general court-martial of desertion with intent to avoid hazardous duty, in violation of the Uniform Code of Military Justice, Article 85, 50 USC § 679. He was sentenced to receive a dishonorable discharge, to total forfeitures, and to confinement at hard labor for three years. Following approval by the convening authority and affirmance by a Navy board of review, this Court granted the accused's petition for review. However, the grant was limited to the correctness of the law officer's instructions on sanity and their prejudicial effect, if erroneous.

II

Scrutiny of the record of trial is required as a preliminary step in determining the import of possible instructional error here—for the reason that, if no issue of sanity was fairly raised by the evidence, prejudice can scarcely. be said to flow from whatever instructional error may be found to exist. United States v. Trede, 2 USCMA 581, 10 CMR 79; United States v. Vigneault, 3 USCMA 247, 12 CMR 3.

When unopposed by evidence, the presumption of sanity would dictate that the members of the court-martial assume that the accused was sane, both at the time of trial and at the time of the offense alleged. Manual for Courts-Martial, United States, 1951, paragraph 138a. Was there such countervailing evidence in the case at bar? In essence, the testimony adduced at the trial affords a vivid picture of the accused as an extremely nervous person suffering seriously from battle fatigue at the time of the desertion charged. Such a condition alone would not in our opinion suffice to raise an issue of incapacity to distinguish right from wrong and to adhere to the right—the legal test for insanity. However, one colloquy in the record does, we consider, operate to raise effectively the question of the accused's sanity. Among defense witnesses was Hospitalman David L. Phillips, who had examined the accused immediately prior to his delict. After describing Biesak's symptoms on direct examination, the witness stated on cross-examination that he did not consider the accused to have been insane "in the meaning of the word 'insane' itself." However, on redirect Phillips ventured the opinion that accused might have been "partly insane." The final question put to this witness came from a court member, who asked whether in the opinion of the witness the accused was "so free from mental defects as to be able, concerning the particular actions charged, to distinguish right from wrong and to adhere to the right." To this the witness replied, "I don't feel that he was, sir, when I saw him at least." The prosecution attempted to rebut this testimony by that of a psychiatrist, who stated that when he examined the accused on the day following the offense, the accused was able "to distinguish between right and wrong with respect to the acts charged, and to adhere to the right."

Although we are unable to criticize the court for its acceptance of the testimony of a qualified psychiatrist over that of Hospitalman Phillips, we cannot avoid the conclusion that an issue

of sanity was raised by the testimony of the latter. It is clear that a mere assertion that one is insane is "not necessarily sufficient to impose any burden of inquiry on the court or to raise the issue of insanity." Manual, supra, paragraph 122b. However, no formal plea is required to warrant inquiry into an accused's sanity, or to raise the issue of insanity before the court-martial. Indeed, the actions and demeanor of the accused, or an appropriate assertion from a reliable source may serve as a proper basis for inquiry into this subject. Manual, paragraph 122b. Moreover, the Manual expressly contemplates the admissibility of lay testimony concerning the general mental condition of an accused—to such an extent as may fall within the bounds of common experience and the means of observation of ordinary men. Manual, paragraph 122c. Other provisions in the Code and the Manual indicate unmistakably that they intended to "set up a sort of preferred treatment for this issue" of insanity. United States v. Burns, 2 USCMA 400, 9 CMR 30. In light of what we find to be a legislative purpose that a liberal construction be adopted in determining the existence of an issue of sanity, we must conclude that Hospitalman Phillips' testimony served to raise the issue. It is evident that he had observed numerous cases of combat fatigue in the course of his military duties, and he had certainly observed the accused shortly before the offense complained of. Thus, Phillips would have had an excellent basis for determining whether the accused was suffering only from a typical case of combat fatigue or whether his mental complications were more severe. Under such circumstances, a duty rested on the law officer adequately to inform the court of the legal criteria relevant to a determination of the issue of insanity—and the absence of such instructions would compel reversal. United States v. Burns, supra. It is not inappropriate to add parenthetically at this point that, in view of the liberal attitude of the Manual toward determining the presence of an issue of insanity in a trial by court-martial, there will be little inclination on our part to find in borderline cases an abuse of discretion by the law officer in instructing thereon.

### III

The law officer's detailed instruction on insanity—adopted apparently from a form instruction in general use—began with the statement:

"You have heard testimony today which has put the sanity of the accused at the time of the alleged commission of the offense into issue. The court is further advised that if it has a reasonable doubt as to the mental responsibility of the accused for an offense charged, the accused cannot legally be convicted of that offense. A person is not mentally responsible in a criminal sense for an offense unless he was, at the time of the offense so far free from mental defect, disease or derangement as to be able concerning the particular act charged both to be able to distinguish right from wrong, and to adhere to the right."

The law officer then defined "mental defect, disease, or derangement," explained the ability to distinguish right from wrong, and discussed irresistible impulse. Thereafter he instructed:

"The accused initially is presumed to have been sane at the time of the alleged offense. This presumption merely supplies the required proof of mental responsibility and authorizes the court to assume the accused's sanity until evidence is presented to the contrary. When, however, as in this case, substantial evidence tending to prove that the accused was insane at the time of the alleged offense is introduced, the sanity of the accused is an essential issue of fact. The burden of proving the sanity of the accused beyond a reasonable doubt, like every other fact necessary to establish the offense alleged, is on the prosecution. If, in the light of all the evidence, *including that supplied by the presumption of sanity,* the court has a reasonable doubt as to the mental responsibility of the accused at the time of the alleged offense the court must find the accused

not guilty of that offense." [Emphasis supplied.]

At this point the law officer launched into the usual instructions on presumption of innocence and reasonable doubt. Manual, supra, Appendix 8, page 518.

The italicized words are those on which the defense has focused its attack. These follow verbatim the language of the Manual, paragraph 122a, and their original source is found in Davis v. United States, 160 US 469. See also Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 168. May this Court set aside as prejudicially erroneous an instruction which does no more than reiterate language of the Manual for Courts-Martial? The chief —perhaps the only—basis for action of this nature would lie in an inconsistency between the Manual and the Uniform Code— in which event the provision of the Manual must fall. United States v. Rosato, 3 USCMA 143, 11 CMR 143. On the other hand, we do not feel empowered to substitute our own predilections, in matters as to which the Code left Manual draftsmen free to choose between competing rules. Referring to the words of the Manual to the effect that sanity is to be determined in the light of all the evidence, *including that supplied by the presumption of sanity*, the defense argues that a fundamental inconsistency does, in fact, exist between Code and Manual. Fully recognizing that under Article 36 of the Code, 50 USC § 611, the President is authorized to prescribe procedure, including modes of proof, in cases tried by courts-martial, they insist that such power must be limited by Article 51(c), 50 USC § 626, which clearly demands that guilt be established by "legal and competent evidence beyond reasonable doubt"—with the burden of proof in this measure resting upon the shoulders of the Government.

Certainly, substantial authority supports the view that a presumption is not and cannot be regarded as evidence. See, e. g., New York Life Ins. Co. v. Gamer, 303 US 161, 82 L ed 726, 58 S Ct 500, 114 ALR 1218; Brown v. Henderson, 285 Mass 192, 189 NE 41; State v. Green, 78 Utah 580, 6 P2d 177; but see Casey v. United States, 276 US 413, 72 L ed 632, 48 S Ct 373; State v. Garver, 190 Ore 291, 225 P2d 771. Following this analytically sound view, it is urged by defense that the Manual's reference to evidence "supplied by the presumption of sanity" constitutes an improper attempt to denominate as "legal and competent evidence" something which, in its very nature, cannot assume such a character. Further, defense argues, if the presumption of sanity is to "supply evidence," then the accused must necessarily bear an artificial burden. By way of illustration—and for the purpose of delineating more fully the position of accused—let us assume that the prosecution has offered testimony tending to establish sanity—testimony which we shall term $X$. For the defense to create a reasonable doubt in the face of $X$ alone may be infinitely easier than to create such a doubt where the effect of $X$ plus $Y$ must be overcome —$Y$ representing the indeterminate amount of "evidence" which the members of the court consider to have been "supplied" by the presumption of sanity. The burden imposed by $Y$ is said by the defense to void completely the principle that an accused is required to do no more than induce reasonable doubt in the court's mind upon the basis of the *evidence* properly presented at the trial—for the most part, testimony offered under oath and subject to cross-examination.

We accept without qualification so much of the defense position as implies an assertion that the words of the Manual might properly be clarified. However, in the instant case, where defense counsel made no request for elaboration or clarification, we are forced— through analysis of the presumption of sanity—to the conclusion that the instruction furnished by the law officer did not prejudice the accused in any substantial right.

This analysis begins with examination of the meaning of the term "presumption," inquiry into which has in-

**719**

terested several legal scholars.[1] In most of the sources mentioned in the margin—and following the terminology of Professor Thayer—the meaning of the word is limited to something in the nature of a compulsory inference, one which, under certain circumstances, is mandatory on the jury. Let $A$ designate the fact proof of which establishes the presumption, and $B$, the fact presumed. If the jury believes $A$, it must ordinarily believe $B$. In this usage of presumption, a judge may in a proper case safely instruct the jury that if $A$ is believed, then B *must be believed*, in the absence of rebuttal. Occasionally reference is made to the existence of a so-called conclusive presumption, described as being irrebuttable. Actually such phrasing is deceptive, for the reason that a conclusive presumption is no more than a rule of substantive law. Instead of saying that, if $A$ is established, then $B$ must be presumed conclusively, it would be more exact to say that $B$ is in fact irrelevant, and that the jury should concentrate its attention solely on whether $A$ does exist.

Thus, the only type of presumption with which we need be concerned in the present problem is the rebuttable presumption of law, from whose binding effect the jury or the court-martial is freed upon production of a certain quantum of evidence. This latter is true, for the reason that, in the case of the rebuttable presumption, the finding of $A$ by the trier of fact does not demand that he also find $B$, if certain minimal evidence has been tendered which indicates that $B$ does not exist. The chief perplexity in this area has to do with the ascertainment of what quantum of proof is necessary to satisfy the evidentiary minimum mentioned above, and thus to free the jury or court-martial from the binding effect

of the presumption. Under the Thayer concept, a presumption vanished at the moment there was placed before the court evidence which would justify a finding against the existence of the fact presumed. Under this view, in a criminal case the presumption of sanity would vanish once evidence was introduced which could operate to produce a reasonable doubt concerning the sanity of the accused. For most purposes, if not for all, any evidence, whether from prosecution or defense witnesses, which sufficed to raise the issue of sanity would cause the presumption of sanity to disappear—and thereby the jury or court-martial would be rid of its prior duty to assume that the accused was sane. The same evidence which sufficed to raise the issue of sanity, and thereby to necessitate the giving of instructions on sanity, would itself banish the presumption from the case—with the result that in the usual case no instruction could thereafter properly be given as to this presumption.

## IV

However, under a system of nomenclature which restricts the meaning of "presumption" to what is in net effect a legally *compulsory* inference, a *permissible* inference may yet remain after the "presumption" vanishes. Wigmore, Evidence, 3d ed, section 2491. In the hypothetical situation mentioned earlier—that wherein $B$ is to be presumed from $A$—it frequently will be true as a matter of sheer human experience that normally when $A$ is present, so also is $B$. In the words of Justice Holmes: "A presumption upon a matter of fact, when it is not merely a disguise for some other principle, means that common experience shows the fact to be so generally true that courts may notice the truth." Greer v. United States, 245 US 559, 62 L ed 469. The

[1] McCormick, What Shall the Trial Judge Tell the Jury About Presumptions? 13 Washington LR 185; Morgan, Techniques in the Use of Presumptions, 24 Iowa LR 413; Gausewitz, Presumptions in a One-Rule World, 5 Vand LR 324; McCormick, Charges on Presumptions and Burden of Proof, 5 NCL Rev 291; Morgan, Further Observations on Presumptions, 16 So Calif L Rev 245; Morgan, How to Approach Burden of Proof and Presumptions, 25 Rocky Mt L Rev 34; Morgan, Presumptions: Their Nature, Purpose and Reason, Publications of Brandeis Lawyers Society; Morgan, Some Observations Concerning Presumptions, 44 Harv L Rev 906; Morgan, Instructing the Jury Upon Presumptions and Burden of Proof, 47 Harv L Rev 59.

opponent of the presumed fact may have introduced evidence tending to show that, in the particular case, *B* was not present, although *A* was; and that evidence may, under the applicable rule, have sufficed to cause the elimination of the presumption, as such, so that the trier of fact was no longer *bound* to assume from *A*'s existence that *B* existed. Yet that fact finder, relying on his or its general experience, might freely infer that in the case before him, *B* was in fact true. On occasion, indeed, such a permissive inference alone might support a finding by the trier that *B* was true. See, e. g., Webre Steib Co. v. Commissioner of Int. Rev. 324 US 164, 89 L ed 819, 65 S Ct 578.

Such reasoning has been utilized in dealing with the presumption of sanity. The Massachusetts court—among others—has indicated that, although the presumption of sanity may vanish, "the fact that a great majority of men are sane and the probability that any particular man is sane may be deemed by a jury to outweigh in evidential value testimony that he (the accused) is insane." Commonwealth · v. Clark, 292 Mass 409, 198 NE 641. See also, Commonwealth v. Cox, 327 Mass 609, 100 NE2d 14. Cf. People v. Chamberlain, 7 Cal2d 257, 60 P2d 299. The court added—properly and cautiously—that it is not "the presumption of sanity that may be weighed as evidence, but rather the rational probability on which the presumption rests." Our decision in United States v. Burns, supra, reaches the same result, although the point was not then expressly considered by us. In that case the Government relied solely on the "presumption of sanity," but the defense offered psychiatric testimony that the accused was insane. Upon review we ordered a rehearing for failure of the law officer to instruct the court concerning insanity, which had been raised by the evidence. We did not, however, dismiss the charges, which would seem to have been called for if the "presumption of sanity"— or, at least, the rational probability which is the core of that presumption —were insufficient to sustain a finding that the accused was sane.

We have no wish to quibble over semantics with those who state that by its nature a presumption of sanity cannot be evidence. Indeed, we doubt that it may be so considered. We are impressed, however, by the fact that in every Anglo-American jurisdiction the presumption of sanity is recognized, and must be overcome by proof in varying degrees by the accused. Leland v. Oregon, 343 US 790, 96 L ed 1302, 72 S Ct 1002. The rational probability on which it rests has been the subject of frequent comment by courts—and, as noted, often suffices, in and of itself, to take a case to the jury or to a court-martial, despite the presence of countervailing evidence. As to every other element of its case, the prosecution must present evidence to obtain the same effect. Eyed pragmatically, the presumption of sanity does achieve the same ends as evidence in many situations, and can occasionally permit a result which would be gainsaid by the only testimony before the court. Cf. Commonwealth v. Iacobino, 319 Pa 65, 178 Atl 823.

Instructions on the question of sanity, like all other instructions, must be read as a whole. Matheson v. United States, 227 US 540, 57 L ed 631, 33 S Ct 355; Agnew v. United States, 165 US 36, 41 L ed 624, 17 S Ct 235; State v. Green, 86 Utah 192, 40 P2d 961. A reading in accordance with this mandate leads us to conclude that the questioned instruction having to do with "evidence supplied by the presumption of sanity" is properly to be construed as no more than an inartful attempt to advise court members that, apart from the existence of the presumption of sanity, they are free to consider all of the evidence before them through the lens of general human experience — especially that which indicates that most men are sane and that insanity may be feigned with ease. Admittedly the Manual for Courts-Martial uses the term, "presumption" of sanity, as one of its two examples of presumptions "which relate to facts which courts are *bound* to presume in the absence of proof to the contrary." Paragraph

138*a*. However, as a "general proposition"—and unlike the customary civilian usage, which deems the term, "presumption," to signify solely a conditionally compulsory inference—military law uses the word as subsuming "merely justifiable inferences," in weighing which members "must apply their common sense and their general knowledge of human nature and the ordinary affairs of life." Manual, idem. Cf. Manual for Courts-Martial, U. S. Army, 1949, paragraph 125*a*; Manual for Courts-Martial, U. S. Army, 1928, paragraph 112*a*. Thus, rightly or wrongly, a "presumption" in military law is normally to be construed as no more than a principle of circumstantial evidence. Reference to a permissive, rather than a mandatory, inference was, we think, intended by the law officer who furnished the instruction attacked in the instant case; and this meaning the members of the court-martial would, we believe, have attributed to the instruction on considering it as a whole. Cf. State v. Harrington, 87 NJL 713, 94 Atl 623; Anderson v. Chicago, R. I. & P. Ry. Co. 189 Iowa 739, 175 NW 583.

Under such an interpretation, we cannot see that supplying the instruction was erroneous. If an inference is sanctioned as justifiable by juristic experience, as a usual thing we are unwilling to conclude that a law officer has abused his discretion in advising the court thereof. Naturally, we are not implying that a law officer is authorized to *direct* the court to accept a particular inference. However, in accordance with our aim to assimilate the status of the law officer, wherever possible, to that of a civilian judge of the Federal system, we shall allow him great freedom to enlighten court members as to inferences which they may draw from the evidence. Cf. Agnew v. United States, supra; McCormick, Charges on Presumptions and Burdens of Proof, 5 NCL Rev 291, 299. Occasionally court members, under a misconception as to the import of the presumption of innocence, may, for example, conceive that they are precluded by that presumption from giving weight to the preponderance of probability revealed by their general experience, and from relying on other than direct testimony of guilt. We believe it to be highly desirable that the law officer should be permitted to utilize his own discretion concerning the wisdom of dispelling such a misconception by instructing on inferences held justifiable by judicial experience. Similarly we would consider that, in most instances, the law officer should grant instructions requested by defense concerning inferences which may permissibly be drawn from the evidence before the court. Of course, when instructing on inferences of this nature, the law officer must avoid any appearance of partisanship.

### V

Although we do not in the instant case consider that, in adverting to the "evidence supplied by the presumption of sanity," the law officer was doing more than informing the court that its members might utilize their general experience that most men are sane, we believe also that the instruction would be sustainable even if the word, "presumption," had been used therein to connote a rule of law that, on a certain state of the evidence, sanity must be presumed. We have previously indicated that the presumption of sanity is supported by a hard core of human experience to the effect that most men are sane. Davis v. United States, 160 US 469, 40 L ed 499, 16 S Ct 353; State v. Harris, 223 NC 697, 28 SE2d 232. In view of this preponderance of probability, it is not deemed unjust to the accused to require that the court take his sanity for granted until, through evidence, some indication of the converse has appeared. Thus, in the usual case, there is avoided the time and effort of introducing evidence that the accused is sane. The presumption of sanity draws strength from other considerations. One of these is found in the fact that evidence bearing on sanity is peculiarly within the control of the accused. Whether he may be compelled

to answer questions, and to give information necessary for a psychiatric inquiry, is veiled in uncertainty. See Guttmacher and Weihofen, Psychiatry and the Law, pages 269–287. A counterpart proposition is that which recognizes that insanity is easily feigned. See Thompson v. Commonwealth, 193 Va 704, 70 SE2d 284. Still another is that, if the presumption of sanity is easily rebuttable, an accused may escape conviction because of the trier's reasonable doubt as to sanity — yet may avoid medical commitment because of the unavailability of evidence sufficient to support the burden of proof required for an adjudication of insanity. Not judges alone have been concerned with the dilemma presented by "morally insane" and psychopathic persons, who, as a practical matter, are too "insane" to be convicted criminally, but not "insane" enough to be long held in a mental institution. See e.g., Cleckley, Mask of Sanity, 2d ed. A consequence of these worries has been the frequently-accepted doctrine that an accused must satisfy the jury of his insanity— which is to say that a rebuttal of the presumption of sanity demands more than mere evidence which would induce a reasonable doubt of sanity. Indeed, at least one American state holds to the rule that the accused must prove his *insanity* beyond a reasonable doubt. Leland v. Oregon, supra. Military law follows Federal precedents in requiring that sanity—once raised—be proved beyond a reasonable doubt. However, under our construction it has modified slightly the Thayer conception that a presumption of sanity vanishes in the face of evidence which, as a matter of law, could induce a reasonable doubt that the accused was sane.

The instant case may serve to exemplify the nature of this modification. Under the notion that a presumption disappears promptly and wholly following the introduction of countervailing testimony concerning the matter presumed, the testimony of Hospitalman Phillips here removed automatically the presumption of sanity. This is true for the reason that we cannot say that no reasonable man could, under any view of that testimony, entertain a reasonable doubt that the accused was sane. However, noting that Phillips' testimony was no model of consistency, we can readily conceive that the members of the court may have disbelieved his testimony, or may have considered that the witness did not sufficiently understand the legal test for insanity to allow weight to be given his opinion.

The Manual refers to the █ continuance of the presumption of accused's sanity, "until a reasonable doubt of his sanity at the time in question appears from the evidence." Paragraph 138a. It is our construction that the word "appears" constitutes a clear reference to the actual mental processes of court members, rather than merely to evidence, which, *if believed*, might induce a reasonable doubt. "Appears" we deem to be directed to the triers of fact. We do not conceive that it was intended by the Manual that court members would be freed from the mandatory inference that the accused was sane, unless and until they accorded the evidence relating to insanity such credence that it induced reasonable doubt in *their* minds. Thus, even in the accepted civilian usage of "presumption," we do not consider that the presumption of sanity vanishes if the court members fail to *believe* the testimony that seeks to establish insanity. Surely there might be evidence that could not reasonably be disbelieved. See Legal and Legislative Basis, Manual, supra, pages 168, 211. However, even psychiatric testimony as to insanity is to be scrutinized closely by court members as to weight and credibility—for there exist oft-remarked divergences between medical and legal criteria of insanity. Holloway v. United States, 148 F2d 665 (CA DC Cir), cert den 334 US 852, 92 L ed 1774. The qualification that the presumption of sanity does not vanish as a *mandatory* inference until the trier of fact has before it testimony that it does not disbelieve, and which tends to show insanity, puts no objectionable additional burden on the accused. He starts with the risk of non-production of evidence on this issue. There is no difficulty in defining the risk as

having to do with the non-production of evidence which is credible and material in the minds of the members of the court-martial, who are charged under the Code with weighing the evidence admitted and with the ultimate determination of its value. We observe that under such a doctrine, it would not be improper in most instances to advert in the instructions to the presumption of sanity, even in the sense of a mandatory inference. This is true for the reason that normally there will exist a possibility that the court-martial may disbelieve all the evidence adduced to indicate insanity, or may not think that, when properly understood, it does tend to show legal insanity. Such a treatment of the presumption of sanity does not, to our way of thinking, trench upon the requirement that guilt must be proved by legal and competent evidence beyond a reasonable doubt—at least to no greater an extent than does the existence of the presumption of sanity itself. Moreover, it seems to comport with respectable precedents. One court has stated expressly in speaking of the presumption of sanity: "If the jury, however, disbelieves the evidence, then the presumption stands." State v. Moore, 42 NM 135, 76 P2d 19. See also State v. Green, 78 Utah 580, 6 P2d 177 (concurring opinion). The Supreme Court of the United States, in holding unconstitutional a statutory rule of "presumptive evidence," mentioned that, "as is necessarily true such evidence must be credited by the jury if the presumption is to be rebutted." Tot v. United States, 319 US 463, 87 L ed 1519, 63 S Ct 1241. While it is not clear that the Court there was dealing with the term "presumption" in the sense of a mandatory, rather than a permissive, inference, we consider the quoted words to adumbrate a doctrine that a presumption disappears only upon the presentation of evidence that the trier of fact does not disbelieve.

## VI

A detailed investigation of presumptions has been reported herein because of the presently confused state of the law in the area, and because in the current Manual the term is used in a different sense, and with a different meaning, than that given it in many civilian writings and opinions. When we consider as a whole the instructions attacked in the instant case, and when we note the references therein to the requirement for conviction that there be no reasonable doubt of sanity, together with the statement that sanity had been put in issue by "substantial evidence," we cannot regard the reference to evidence "supplied by the presumption of sanity" as constituting more than advice to court members that they may properly consider all of the evidence in the light of the human experience that most men are sane. However, even though the instruction were construed to mean that under some evaluation of the evidence, the court might be constrained to find that the accused was sane, we believe that this signified no more than that credible evidence was required to dissipate the presumption, and that court members should not concern themselves with the issue of sanity if they gave no credence to the testimony of Hospitalman Phillips. Neither of the constructions thus attributable to the charge in question departs from relevant and recognized legal principles. It was the task of defense counsel to request clarification if he considered that the instruction given might confuse the court.

It must be clear from what has been said earlier in these pages that, in our view, and because of its inartful quality, it would be preferable to omit from future instructions in this area any reference to evidence "supplied by the presumption of sanity." Of course, the court-martial may always be advised of the applicability of generalized human experience to the resolution of any issue of sanity raised by the evidence.

## VII

From the foregoing it must appear that we have not found error in the present record. Accordingly, the findings and sentence must be affirmed.

Chief Judge QUINN and Judge LATIMER concur.