UNITED STATES, Appellee

v.

ROY L. JOHNSON, Private E–1, U. S. Army, Appellant

3 USCMA 725, 14 CMR 143

No. 2588

Decided February 12, 1954

LT COL James C. Hamilton, U. S. Army, for Appellant.
LT COL William R. Ward, U. S. Army, and 1ST LT Martin Blackman, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Johnson, was convicted by an Army general court-martial of fraudulent enlistment and of inflicting self-injury, in violation respectively of Articles 83 and 115 of the Uniform Code of Military Justice, 50 USC § 677 and § 709. The correctness of this action is questioned by the petition of the accused, who maintains that the law officer's instructions prejudiced him in his defense of insanity. These instructions were in terms substantially identical with those considered by this Court in United States v. Biesak, 3 USCMA 714, 14 CMR 132, and included a similar reference by the law officer to "evidence supplied by the presumption of insanity." Additionally no advice was furnished the court concerning any rule of law to the effect that insanity, once shown to exist, is presumed to continue in effect.

## II

The overwhelming evidence, including testimony by the accused, left no doubt that at the time he enlisted on April 25, 1952, he concealed a prior Army enlistment effected on March 4, 1952. Concerning the self-injury, the evidence established that the accused was confined in the Indiantown Gap Military Reservation stockade under administrative segregation, apparently pending disposition as a fraudulent enlistee. As the aftermath of an unrelated incident which took place within the stockade, Major Sprinkle, the Post Confinement Officer, was engaged in the inspection of various cells. Major Sprinkle directed that the accused remain silent during the former's conversation with another prisoner. Thereupon the accused secured a safety razor blade, and uttered profane expressions of defiance to the general effect that the first person to enter his cell was "going to get your throat cut." Major Sprinkle and two subordinates grappled with Johnson, who then directed the blade against himself and inflicted a deep wrist incision.

When examined as a witness concerning the accused's mental condition, Major Sprinkle observed that "up until the incident of the wrist slashing, Johnson, in my opinion, was one of the more intelligent prisoners in the stockade and he acted intelligent and in a normal manner." This sanguine appraisal of the accused is somewhat at variance with the estimates of several prison guards, who told the court-martial of Private Johnson's growing tension due to confinement, and who described him as the possessor of "weird eyes," the originator of a "weird noise," "sitting looking around his cell like he was in a daze" and "gritting his teeth"—one who "looks like a maniac capable of doing anything." One witness stated that accused was "out of his head"—an opinion not too surprising in light of further testimony to the effect that he appears to have engaged regularly in the odd exercise of striking his head against the wall for periods of as long as five minutes' duration. Captain Hill, the Assistant Confinement Officer, described this "normal" and "intelligent" prisoner as seeming to "go completely off his rock" during the razor blade episode. The accused took the stand to relate significant incidents in his past, including two years of study at the University of Alabama, a degree in Business Administration, and sojourns in a Federal correction institution, in the United States Medical Center at Springfield, Missouri, and in various veterans' hospitals. The accused had originally entered the service in 1942 and was discharged therefrom in 1944, apparently following a psychiatric examination. Thereafter a desire to enjoy further military service was indicated by his "approximately 7" fraudulent enlistments. A certificate of identity, introduced by the prosecution, verified in general the accused's account of these fraudulent enlistments. To corroborate testimony regarding a prior adjudication of insanity, the defense introduced, without objection, a record of proceedings held October 2, 1951, before a Colorado county judge, which directed the commitment of one Grover J. C. Garrett—a name stipulated to have been one of the accused's several aliases. The certificate of the judge described the accused's condition as "Psychopathic personality—with alcoholism & epilepsy." The order of commitment further recited on a printed form a finding by the Lunacy Commission that the "said Grover J. C. Garrett . . . (1) is so insane or distracted in his mind as to endanger h— own person or property, or the person or property of another, or others, if allowed to go at large; . . . (2) is not dangerously insane nor mentally defective, but is, by reason of old age, disease, weakness of mind, feebleness of mind, or from other causes incapable, unassisted, to properly manage and care for himself or his property." An attached and authenticated letter from the Colorado State Hospital to the Judge of the Denver County Court stated that Grover J. Garrett had been carried by the hospital in an escape status, effective March 1, 1952.

The prosecution's rebuttal consisted of a brief stipulation of testimony expected from Captain Robert M. Counts,

Chief of the Mental Hygiene Consultation Service, Indiantown Gap Military Reservation, to the effect that, on the basis of an approximately 15-hour examination of the accused, the conclusion was reached that he knew right from wrong and could adhere to the right at the time of the offense, and that he was able to participate intelligently in his own defense.

## III

Before considering the adequacy of the law officer's instructions, comment is not inappropriate concerning the sufficiency of the evidence to support the court's finding that the accused was sane. As observed by us in United States v. Biesak, supra, the ■ human experience that most persons are sane, and the consequent rational probability that a particular man is sane, can permissibly "be deemed by a jury to outweigh, in evidential value, testimony that he is insane." Commonwealth v. Clark, 292 Mass 409, 198 NE 641; Commonwealth v. Cox, 327 Mass 609, 100 NE 2d 14. In the present case this "probability" is bolstered by the stipulated testimony of Captain Counts to the effect that the accused was legally sane.[1] In addition to this testimony, the members of the court had enjoyed an opportunity to observe the accused as he testified—and we believe it fair to say that, so far as our contact with the printed record page is concerned, the accused's testimony seems lucid and intelligent. Cf. People v. Chamberlain, 7 Cal2d 257, 60 P2d 299.

The testimony of the prison guards may have been somewhat discounted by the court-martial, and especially so in the light of the explicit statements of the Confinement Officer. The accused's own statement certainly revealed a senseless succession of fraudulent enlistments. However, it appears that these frauds had not been punished theretofore—a matter which may have seemed significant to court members in their purpose to determine whether the accused's impulse to enlist fraudulently was truly irresistible.

## IV

The evidence of the Colorado lunacy proceeding presents a special problem. Indeed, it has been suggested that, to give that proceeding the full faith and credit to which it is entitled as an adjudication by a court of competent jurisdiction, requires acceptance of the idea that the accused in the instant case was insane. This contention seems to amount to an assertion that, in view of the Colorado decree, the accused must be conclusively deemed insane; that he may not be legally convicted of an offense; and that he should not have been tried in the first instance. We doubt that the Colorado ■ judgment of commitment is an unimpeachable judgment, in the sense that every other court in the land is bound to give it full faith and credit. Cf. Brewer v. Hunter, 163 F2d 341 (CA 10th Cir); Cubbison v. Cubbison, 45 Ariz 14, 40 P2d 86. Moreover, we believe that such a judgment would—if it controlled at all—only govern other forums with respect to the accused's sanity as of October 2, 1951, the date the judgment was rendered. Clearly there are many mental conditions which are subject to ■ change—and, in the absence of a clear showing that accused was adjudicated insane by reason of a *permanent* mental condition, we cannot believe that the court-martial here was bound by the prior finding.

Most important of all, under the usual requirement of full faith and credit, a judgment need not ■ be accorded greater effect outside the jurisdiction where rendered than within it. Under the law of Colorado, a judgment of the

---

[1] Perhaps the most unsatisfying feature of the present case is the fact that Captain Counts was not called as a witness to state his qualifications as an expert, and to make explicit his criteria for concluding that the accused was sane. Since he was not called as a witness to defend in person his psychiatric conclusions or his expertise in the field, we should note in passing that the papers attached to the instant record of trial reveal that similar determinations of sanity were made on June 23, 1952, by a three-man board of Navy doctors, and again on July 9, 1952, by an Army psychiatrist.

type now in question would *not* have been binding in a subsequent criminal prosecution of the accused in that state. See Arridy v. People, 103 Colo 29, 82 P2d 757. The reasoning employed in reaching this result under Colorado law is that the tests utilized for adjudicating a person a lunatic in a civil proceeding are less restricted than those adopted for the criminal law. Thus, a person may have been committed to an institution, yet at the same time may well be able to discern the difference between right and wrong and to adhere to the right with respect to an offense for which he may later be prosecuted. Arridy v. People, supra; Gulley v. Commonwealth, 284 Ky 98, 143 SW2d 1059. So in the instant case, the judge's certificate, introduced in evidence by the defense, describes the accused as a "psychopathic personality" complicated by "alcoholism and epilepsy." "Psychopathic personality" is, in military law, a term used to describe a ▆▆▆ █ "defect of character, will power, or behavior," which does not negate criminal responsibility. Psychiatry in Military Law, TM 8–240, AFM 160–42, paragraph 3*a*; Manual for Courts-Martial, supra, paragraph 120*b*.[2] "Alcoholism" is likewise not viewed as a defense. Psychiatry in Military Law, supra, paragraph 10*a*. An epileptic seizure which produces an offense, would. of course, ▆▆▆ █ constitute a defense. However, an underlying epileptic condition does not at all signify that an accused committed a particular offense during a moment when reason was dethroned by epilepsy. For example, it is difficult to imagine that, during the entire period involved in his enlistment on April 25, 1952, the accused was in the throes of an epileptic fit unnoted by recruiters. The finding of the Lunacy Commission that the ac-

cused might endanger his own property, and that of others, if allowed at large, is distinctly not a finding of insanity in the criminal sense. A defect of "character, will power or behavior," within the meaning of the Manual's language, might well have been the basis for the Commission's determination that the accused, by his freedom, menaced the property of others. However, as mentioned above, such a defect would not negate criminal responsibility under military law. Accordingly, we decline the suggestion that any problem of full faith and credit is raised in the case at hand.

V

Occasionally courts have proclaimed that a civil adjudication of insanity rebuts any presumption of sanity in a subsequent criminal prosecution, with the result that a conviction cannot be supported in the absence of testimony or other evidence that the accused was sane. Ashley v. Pescor, 147 F2d 318 (CA 8th Cir); People v. Nierstheimer, 401 Ill 260, 81 NE2d 900; see also Brewer v. Hunter, supra. It must be apparent that use of this doctrine in the instant case is barred by the specific evidence that the accused was, in the legal sense, sane. Still, we think it important to make clear that, ▆▆▆ █ in our view, a civil adjudication of insanity does not —even though unrefuted—demand dismissal of criminal charges, unless the adjudication contains a finding that the accused could not distinguish right from wrong and adhere to the right. Thus we do not deem that commitment by reason of feeblemindedness or imbecility has the necessary effect of rebutting the presumption of sanity, whether the latter term is used in the sense of a mandatory inference or only of a per-

[2] See also United States v. Trede, 2 USCMA 581, 10 CMR 79; United States v. Heneage, 4 BR–JC 89; Fisher v. United States, 328 US 463, 90 L ed 1382, 66 S Ct 1318, 166 ALR 1176; Brummett v. State, 181 So 323 (Miss); Coffey v. State, 244 Ala 514, 14 So2d 122. The opinion in United States v. Batson, 11 BR–JC 67, reveals that at the trial Dr. Harvey Cleckley—a leading authority on the psychopath—testified that the accused suffered from a psychopathic personality, but was sane "in the ordinary sense." Apparently extensive psychiatric testimony was offered to the same effect in Commonwealth v. McCann, 325 Mass 510, 91 NE2d 214. Accord, Davidson, Forensic Psychiatry, page 21 (1952).

missive one. See, Arridy v. People, supra; Gulley v. Commonwealth, supra; Fisher v. State, 140 Neb 216, 299 NW 501, and other cases collected in Annotation: Presumption-Continuing Insanity, 27 ALR2d 121, at 143; but cf. People v. Nierstheimer, supra. Similarly we do not feel that the adjudication of lunacy in the case at bar would have demanded acquittal had the prosecution offered no evidence of sanity—since that adjudication did not, on its face, rest on a determination that the accused could not distinguish between right and wrong and adhere to the right.

## VI

The case of State v. Garver, 190 Ore 291, 225 P2d 771, heavily relied on by appellate defense counsel, is clearly distinguishable from the case at bar. Conceding arguendo that the Colorado adjudication necessarily involved a finding that the accused was insane in the eyes of the criminal law, we are sure that, upon request, the law officer should have instructed to the effect that a condition of insanity, once shown to exist, is presumed to continue in effect. In this way the accused would be given the full benefit of a consideration by court members of the question of whether, under their interpretation of the significance of the commitment proceedings and their understanding of the law officer's instruction as to what constitutes insanity, the accused was unable to distinguish between right and wrong, to adhere to the right and to cooperate in his defense as of the appropriate dates. To deny such an instruction, when requested, would, we believe, constitute reversible error. However, here no such request was made. If there is no such request, the law officer may use his own discretion in determining whether to furnish the court with such advice. Quattlebaum v. State, 119 Ga 433, 46 SE 677. The rule in this situation may be analogized to that governing the necessity for an instruction on evidence of the accused's good character. The law officer is not required to instruct the court sua sponte on the import of such

evidence—but he cannot safely refuse a defense request for such an instruction. United States v. Schumacher, 2 USCMA 134, 7 CMR 10; United States v. Browning, 1 USCMA 599, 5 CMR 27. Of course, in giving an instruction regarding the presumption of continuing insanity, the law officer may wish to avoid misunderstanding through emphasis on the principle that only a chronic, habitual or permanent insanity is presumed to continue in effect—and that, for such a presumption to have effect, the initial "insanity" must constitute insanity within the meaning of the Manual's test.

## VII

With reference to the instructions actually utilized by the law officer here—which are identical to those given in United States v. Biesak, supra—we need not reiterate in detail the interpretation adopted in that opinion. Briefly, we decided there that the questioned reference to "evidence supplied by the presumption of sanity" constituted no more than advice — perhaps inartfully phrased—to court members that they were permitted to consider in their deliberations the general human experience that most persons are sane. This experience, we believe, is ever a factor for consideration by a court-martial, or by a jury, in deliberating on the sanity of an accused. Therefore we cannot find error in furnishing an instruction to that effect.

Additionally we pointed out there that, although the instruction had been viewed as going further—which we do not feel to be the case either there or here—and informing court members that under certain circumstances they would be *bound* to find the accused sane, we would be unwilling to find prejudicial error. This view is based on our concept that the presumption of sanity, in the sense of a mandatory inference, cannot be dispelled by evidence which the finder of fact disbelieves, or which, under proper instructions, he does not regard as tending to show that the accused was insane within the meaning of

military law. An instruction on the subject of this mandatory ▮▮▮▮ inference would not, we believe, constitute error, provided any reasonable possibility exists that the finder of fact might disbelieve the evidence adduced to show insanity, or might interpret it to have a different effect. In our view, the instant case falls within this category. Certain defense evidence here might have been disbelieved entirely, and other might be regarded as more nearly consistent with an interpretation of a mere character disorder rather than of insanity.

As to the Colorado court's decree, we consider that its terms are so vague and uncertain that reasonable ▮▮▮▮ minds might adopt different interpretations of its meaning. Within the gamut of permissible interpretations is one suggesting that these prior judicial proceedings evidenced that the accused's erratic behavior was attributable to no more than a defect of "character, will power, or behavior," and not at all to an inability to distinguish between right and wrong and to adhere to the right. Under that interpretation the presumption of sanity would retain its pristine strength. The possibility of this interpretation—as previously suggested — precludes us from holding, as a matter of law, that the initial presumption of sanity was rebutted. On the other hand, the court, in weighing the evidence, could permissibly have concluded that the adjudication of lunacy tended clearly to show that the accused did not know right from wrong on October 2, 1951, the date of the court order; and could have entertained a reasonable doubt that this mental condition changed thereafter.

## VIII

Having concluded that the evidence was sufficient to support the court-martial's determination of accused's sanity, and that, in the absence of a request for further instructions, those of the law officer were adequate and not erroneous, we must necessarily affirm the decision of the board of review.

Chief Judge QUINN and Judge LATIMER concur.