68

UNITED STATES, Appellee,

v.

Milton E. HARGROVE, Specialist Five
U.S. Army, Appellant.

No. 51,774.

CM 443107.

U.S. Court of Military Appeals.

Sept. 25, 1987.

For Appellant: *Captain William J. Kil-gallin* (argued); *Colonel Brooks B. La-Grua, Lieutenant Colonel Arthur L. Hunt, Major Marion E. Winter, Captain Pamela O. Barron* (on brief); *Lieutenant Colonel Paul J. Luedtke* and *Captain Rita R. Carroll.*

For Appellee: *Captain Denise K. Vowell* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Lieutenant Colonel Joseph A. Rehyansky, Captain Howard G. Cooley* (on brief); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Captain Dean C. Berry.*

## Opinion of the Court

COX, Judge:

Appellant was tried by general court-martial with members and found guilty[1] of two specifications of murder by committing "an act inherently dangerous to others" and two specifications of aggravated assault, in violation of Articles 118 (3) and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 918(3) and 928, respectively. He was sentenced to be confined for 20 years, dishonorably discharged from the service, and reduced in grade to E–1. The findings and sentence were approved by the convening authority, and the Court of Military Review affirmed in an unpublished opinion.

We granted review of the following issues:

### I

WHETHER, TO APPELLANT'S PREJUDICE, THE MILITARY JUDGE ERRONEOUSLY INSTRUCTED THE COURT MEMBERS REGARDING CRITICAL ASPECTS OF THE LAW.

### II

WHETHER AS THE RESULT OF THE IMPROPER ACTIONS OF ONE OF THE PANEL MEMBERS IN INDEPENDENTLY INVESTIGATING THE CIRCUMSTANCES SURROUNDING THE OFFENSES, THE FINDINGS OF GUILTY WERE BASED UPON MATTERS NOT ADMITTED INTO EVIDENCE AT APPELLANT'S TRIAL.

*Issue I*

### A. *Definition of wanton disregard for human life.*

■ Appellant's conviction was based on evidence which established that, while he was inside an M–60A3 tank, he fired a sabot round from the main gun of the tank into another tank, causing two soldiers to be killed and two others to be seriously injured. His conviction of murder was predicated on a finding that he committed "an act inherently dangerous to others and evincing a wanton disregard for human life."

The question of appellant's sanity was litigated extensively at trial. The military judge, in his instructions to the court members, defined what type action would support a finding of guilty for the offense of murder under Article 118(3), as follows:

For an act to be inherently dangerous to others and demonstrate a wanton disregard for human life, the act must (a) be inherently dangerous to, and show a wanton disregard for, the life of more than one person; (b) be such that its probable results, *if* known to the accused, would be death or great bodily harm; and (c) be intentionally done by the accused, although death or great bodily harm does not have to be the intended result; and (d) demonstrate a total disregard for the known probable results of death or great bodily harm.

(Emphasis added.) Defense counsel made no objection to this instruction. Later, when the military judge used the same text to reinstruct the court members, defense counsel observed that the word "if" had been added, but he did not specifically assert that the instruction was thereby made erroneous.

■ Appellant asserts on appeal that the addition of the word "if" to the instruction would permit a finding of guilty of the offense of unpremeditated murder without proof of knowledge of the probable results of the perpetrated act. Therefore, the in-

---

1. Appellant was also charged with two specifications of premeditated murder and two specifications of attempted unpremeditated murder. No findings were returned as to these offenses. We believe the better practice would be to make specific dispositions as to all offenses charged.

structions blurred the distinction between unpremeditated murder and manslaughter. *See United States v. Stokes,* 6 U.S.C.M.A. 65, 19 C.M.R. 191 (1955). We disagree.

The military judge specifically instructed the members that appellant's act must "demonstrate a total disregard for the *known* probable results of death or great bodily harm." (Emphasis added.) Therefore, the knowledge requirement was clearly set forth in the instruction. When read in context and *in toto,* it is apparent that the military judge used the word "if" to imply that an accused must know the probable consequences of his actions.

Furthermore, trial defense counsel did not object to the instruction, and his failure to do so constitutes waiver absent plain error. *United States v. Yanke,* 23 M.J. 144 (C.M.A.1987); *United States v. Fisher,* 21 M.J. 327 (C.M.A.1986).

B. *Legal standard regarding insanity.*

■ Appellant's second contention is that the instructions on insanity were improper. The instructions were initially discussed during an *in camera*[2] session. The proposed instruction included a definition of the standard for sanity set forth in *United States v. Frederick,* 3 M.J. 230 (C.M.A. 1977). Additionally, the judge proposed to define what the term "substantial ... impairment" meant, as follows: "A lack of substantial mental capacity exists when there is a substantial or great impairment of that capacity, but a complete impairment is not required." Trial defense counsel objected to this language, stating that, under the applicable standard in *Frederick,* appellant could not be found guilty if he lacked substantial capacity. The defense contended that the word "substantial" required a quantity more than 50 percent of total capacity. Counsel reasoned that using the same word to define a degree of impairment would require impairment in excess of 50 percent. Thus, while one part of the instruction required a finding of substantial capacity, the other part of the instruction required a finding of substantial impairment. Counsel argued that, in effect,

the two parts of the instructions were mathematically inconsistent under the *Frederick* standard because an impairment could be less than substantial, but still be enough to preclude a finding of substantial capacity.

Because of the use of negative implications of the prefixes, adverbs, adjectives, and nouns used in the test, the argument of defense counsel has appeal at first blush. Indeed, the military judge initially agreed not to use this definition. However, as the testimony of the witnesses on the sanity issue unfolded, he changed his mind, finding that defense counsel had cross-examined the witnesses in a manner consistent with his proposed instruction. Close examination of the instruction demonstrates that the judge was correct.

In *United States v. Frederick, supra* at 234, we adopted the test for sanity recommended by the American Law Institute (A.L.I.) as follows:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks *substantial capacity* either to appreciate the criminality ... of his conduct or to conform his conduct to the requirements of law.

(2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(Emphasis added.) We adopted the standard because of its general acceptance by Federal courts; however, as a result of the criticism directed at the standard, it was later statutorily rejected by Congress. Art. 50a, Pub.L. No. 99–661, Div. A, Title VIII, § 802(a)(1), 100 Stat. 3905 (1986); 18 U.S.C. § 20; *see United States v. Cortes-Crespo,* 13 M.J. 420, 421 and n. 2 (C.M.A. 1982). Nevertheless, here the *Frederick* standard must be met because the congressional modifications apply only prospectively. § 802(b).

---

2. Art. 39(a), Uniform Code of Military Justice,

10 U.S.C. § 839(a).

We previously have rejected contentions that the words used in the quoted standard should be further defined. *United States v. Cortes-Crespo, supra.* Obviously, the A.L.I. standard rejected the rule that an accused's mental impairment must be complete, but it did not precisely define the degree of impairment required in terms of percentages. In the explanatory note to the standard in question, the authors observe that it "does not require a total lack of capacity, only that capacity be insubstantial." *Model Penal Code and Commentaries* § 4.01, Explanatory Note at 164 (1985 reprint).

We find that the instruction correctly stated the law as it relates to accused's mental capacity. A "lack of" capacity is that condition which exists in a person whose capacity has been "impaired." The word "substantial" modifies "capacity," and it has never been equated to a mathematical standard. Determining what is or is not substantial is a responsibility that rests within the purview of the factfinders. Also, appellant's argument that "insubstantial impairment" could cause a lack of substantial capacity fails to comprehend that the term "insubstantial impairment" contains a double negative. "Insubstantial" means tenuous, immaterial, thin, or unsubstantial. "Impairment" means deterioration, degeneration, decline, waste, atrophy, disintegration; and damage, imperfection, disadvantage. *Roget's International Thesaurus* 1031; 544; 1016 (4th ed. 1977). Therefore, one can conclude that, taken together, "insubstantial impairment" means a slight or immaterial injury that could not rise to a level high enough to cause a lack of substantial capacity.

### C. *Presumption of sanity.*

█ Finally, appellate defense counsel objects to the judge's instruction on sanity, asserting that the judge, in effect, instructed that there is a presumption that people are sane. We disagree. During an out-of-court session on proposed instructions, defense counsel asserted that no instruction on the presumption of sanity should be given because the modern Federal view was that the presumption disappeared once evidence reflecting lack of sanity was introduced. The military judge indicated that he would not give an instruction on the presumption, but he did give the following instruction:

In deciding the issue of the accused's sanity at the time of the alleged offenses, you may rely on your own common sense and your general knowledge of human nature. Therefore, *you may consider that the general experience of mankind is that most people are sane.* Of course, your focus at this juncture is on the mental responsibility of the accused, Specialist Hargrove, and along with the other issues in this case [it] is for you to determine, based upon the evidence which has been presented in this court-martial, whether he was sane or mentally responsible at the time of the alleged offenses, that is, on 4 November 1980.

The burden of proving the sanity of the accused is on the prosecution. The accused is not required to prove that he was insane at the time of the alleged offenses. If, after considering all of the evidence, as well as your common sense and general knowledge of human nature, you have a reasonable doubt as to the mental responsibility or sanity of the accused at the time of the alleged offenses, that is, on or about 4 November 1980, you must find the accused not guilty.

(Emphasis added.)

Counsel now argue, as did trial defense counsel, that the emphasized portion of the quoted instruction is, in effect, an instruction on the presumption of sanity. In *United States v. Oakley,* 11 U.S.C.M.A. 187, 29 C.M.R. 3 (1960), this Court approved an instruction containing essentially the same language used here. Judge Ferguson, in a separate concurrence, observed the following:

In sum, then, I believe it improper to advise the members of a court-martial that the accused is presumed to be sane when sufficient evidence has been introduced to raise an issue concerning his

mental responsibility. *United States v. Biesak*, supra [3 U.S.C.M.A. 714, 14 C.M.R. 132 (1954)]; *United States v. Ball*, supra [8 U.S.C.M.A. 25, 23 C.M.R. 249 (1957)]. It should be equally apparent that, should no such issue be raised, instructions on sanity are normally not required, for there is little reason to present legal principles to a jury *in vacuo*. However, the fact that the presumption is eliminated does not mean that the fact finders may not consider its predicate and conclude therefrom that evidence of irresponsibility should be rejected. In weighing evidence, a member is expected to utilize his common sense and his knowledge of human nature and of the ways of the world. Manual for Courts-Martial, United States, 1951, paragraph 74a (2). It may, therefore, be proper to call fairly to the attention of the court-martial that they may take into account the common experience of mankind in weighing the question before them. *Davis v. United States*, supra [160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895)]; Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 168.

11 U.S.C.M.A. at 191, 29 C.M.R. at 7. Thus, we reject appellant's contention that a reference to "common sense and ... knowledge" is equivalent to an evidentiary presumption. Issue I is resolved against appellant.

### Issue II

▮ The second issue was initially raised before the Court of Military Review in an affidavit executed by a member of the court-martial and submitted to the court which stated:

During the course of the court-martial of SP5 Hargrove, in October 1981, I Randolph A. Oberlin, MAJ, USA did use two tanks to simulate the positions of the vehicles on the night of the incident. This occurred in my unit's tank park but I cannot recall the specific date. At the time I was the executive officer of the 2d Battalion, 33d Armor. I used my tank and another tank from the Headquarters Tank Section. My purpose was to verify what part, if anything of the rear tank could be seen by looking through the sights and/or range finder of forward vehicle with the gun in travel lock. I also looked through the open breech of the main gun with the muzzle cover on. As I supposed, the vehicle in the rear could not be seen. I did not discuss what or why I was doing this with any of the tank crewmen involved and they were not present with me inside the turret when I was looking through the sights. I was attempting to gain some insight into what may have been Hargrove's intent on that night. The result of my efforts were inconclusive. Information gained as a result of this was not a factor in my personal decision in the matter of guilt or innocence nor was it used in any way to influence other panel members. As I recall, the matter of intent to kill was not relevant in the case, although, at the time of my experiment I did not know this. This is, to the best of my knowledge, what I did and why I did it. /////////FURTHER AFFIANT SAYETH NAUGHT//////////// s/ Randolph A. Oberlin

On the basis of the foregoing, appellant submits that he is either entitled to a new trial or a hearing on the issue of the alleged improper conduct by the court member. Both the Government and appellant agree that the conduct of the member was error but disagree as to whether a presumption of prejudice exists which would require a new hearing or whether appellant has the burden to prove prejudice. *Compare Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *United States v. Pennell*, 737 F.2d 521 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *with Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *United States v. Wolfe*, 8 U.S.C.M.A. 247, 24 C.M.R. 57 (1957); *United States v. Webb*, 8 U.S.C.M.A. 70, 23 C.M.R. 294 (1957). We need not now resolve that issue because we are convinced

beyond any reasonable doubt that appellant was not prejudiced, even if we assume *arguendo* that the court member's conduct raises a rebuttable presumption of prejudice.

Furthermore, we are normally hesitant to decide this important issue based upon a court member's affidavit. *See United States v. Accordino,* 20 M.J. 102 (C.M.A. 1985); *United States v. Witherspoon,* 16 M.J. 252 (C.M.A.1983). But "[i]n some cases, post-trial claims of misconduct by court-martial members can be satisfactorily resolved on the basis of affidavits." 16 M.J. at 255 (Everett, C.J., concurring in the result).

Importantly, the court member's affidavit clearly acknowledges his acts and his purpose and affirmatively states that the out-of-court experiment did not influence his vote. Normally, these self-serving types of affidavits may not suffice. Here, however, appellant was charged with premeditated murder and attempted murder, both charges requiring proof of the specific intent to kill. He was found guilty of the lesser offenses of murder resulting from an "inherently dangerous act" and of aggravated assault. The real issue before the members was whether the accused was mentally responsible for the offense and not whether the round was fired accidentally or intentionally. Additionally, we observe that the other court members apparently had some experience relative to the operation of tank vehicles, so it would appear that the operational capabilities of the tank in question were, at least to some extent, already known by the court members. We conclude beyond any reasonable doubt appellant has not been prejudiced.

The decision of the United States Army Court of Military Review is affirmed.

Judge SULLIVAN concurs.

EVERETT, Chief Judge (concurring in part and dissenting in part):

Although the evidentiary experiment performed by one of the court-martial members was improper, I agree that appellant was not prejudiced thereby. (Issue II.)

However, I dissent from the majority opinion's approval of the military judge's instructions. (Issue I.) Hargrove was found guilty of murdering two other soldiers by firing a round from a gun of one tank into another tank parked in line about ten feet away, this being "an act which is inherently dangerous to others and evinces a wanton disregard of human life." See Art. 118(3), Uniform Code of Military Justice, 10 U.S.C. § 918(3). The military judge instructed that, as one of four conditions "[f]or an act to be inherently dangerous to others," the act must "be such that its probable results, *if known to the accused,* would be death or great bodily harm." (Emphasis added.) After deliberating the remainder of the day and much of the following day, the members returned to ask that certain instructions be repeated. In fact, one member specifically requested that the explanation of "wanton disregard" be repeated. Twice more, the military judge gave the quoted instruction.

At this point, defense counsel objected that the word "if" had been incorrectly inserted; and he asked for an instruction without that word. This request simply was for an instruction in conformance with the model instruction which is now on page 3–172 of the *Military Judges' Benchbook* that the lethal act must "be such that its probable results, *known to the accused,* would be death or great bodily harm." (Emphasis added.) However, the military judge repeated a fourth time the instruction which included the word "if."

Appellant now asserts that the instruction with this word inserted implied that no actual knowledge of the probable results was required of the accused. Thus, the difference between murder and involuntary manslaughter was obscured. I am not enough of a grammarian to know what use of "if" would have suggested to the court members. I cannot understand why the judge insisted on retaining the word in the face of defense counsel's objection and in light of the court members' obvious desire to obtain a precise understanding of the meaning of the term "wanton disregard." On balance, I cannot say that the instruc-

tion as given is so confusing as to merit reversal; but I believe that the military judge should have instructed as requested by the defense.

The military judge proposed to give preliminary instructions to the members that "lack of substantial capacity exists when there is *a substantial or great impairment of that capacity,* but a complete impairment is not required." (Emphasis added.) This instruction conformed to the model now suggested on page 6–4 of the *Military Judges' Benchbook* (May 1982). Defense counsel objected to the instruction. He explained that, assuming for purposes of argument that "substantial" means 75%, then "lack of substantial capacity" would mean that the accused would have 74% or less capacity. On the other hand, if again it is assumed that "substantial" means 75%, then "substantial or great impairment of that capacity" would require that the impairment be 75% or greater. Counsel argued that the latter actually is the inverse of the former, correct standard. Thus, under the correct standard, an accused with 74% capacity would not have the requisite capacity, while under the incorrect one he would. In response, the military judge proposed language that "[t]he legal criteria is a lack of substantial capacity. A complete impairment is not required." Defense counsel agreed to this, and the military judge preliminarily instructed in this manner.

When it came time for final instructions, the military judge reversed himself. He offered two reasons for doing so: "One, I think the legal ambiguity pointed to by the defense counsel is, as I said, well recognized in the law. I don't think it's unique to the instructions which I propose." Second, he pointed out that defense counsel's questioning of his expert witnesses had been concerned with substantial impairment—which counsel had urged was the incorrect standard—and not with "lack of substantial capacity"—which counsel had urged was the correct test. After expressing concern over defense counsel's tactics in arguing that the standard used in the model instruction was incorrect and then "rather meticulously ... questioning" his

witnesses along the lines of that standard, the military judge concluded, "[I]f there is any undue emphasis on this standard, it originated not with the court, but with the defense, which ... made this subject the focus of rather pointed questioning." Thereafter, the military judge instructed as he had originally proposed to do.

Under one interpretation the two standards are different. Moreover, I agree that the standard requested by the defense—rather than that found in the Benchbood—conforms to the American Law Institute's criteria for mental responsibility which were adopted by this Court in *United States v. Frederick,* 3 M.J. 230, 234 (C.M.A.1977). Therefore, the focus must be on the reasons for the judge's change of position.

As to the judge's first justification, I cannot understand why his recognition of "the legal ambiguity" justifies his denial of the defense's requested clarification. The judge's primary reason for changing his instruction was probably his concern that counsel had trapped him by successfully arguing that the Benchbook's model instruction was incorrect and then examining his witnesses in terms of the allegedly incorrect standard embodied in that instruction. The remedy, however, was for trial counsel or the judge to seek clarification from the witnesses while they were being questioned, rather than for the judge later to compound confusion in instructing the members.

Whatever his reason for initially agreeing to change the instruction, the fact is that the error in the model instruction was timely brought to this judge's attention and was well-illustrated by a hypothetical. The judge had the sole responsibility for rendering correct instructions, but he failed to do so.

Usually, I would be reluctant to reverse for an instructional error like this. However, in light of the evidence in this case and the court members' obvious concern about Hargrove's mental state at the time of the incident, I conclude that appellant was prejudiced and that a rehearing should be granted so that his mental responsibility can be determined under proper instructions.