UNITED STATES, Appellant

v.

MATTHEW B. HIGGINS, Jr., Private E–2, U. S Army, Appellee

4 USCMA 143, 15 CMR 143

No. 3145

Decided April 9, 1954

LT COL William R. Ward, U. S. Army, and MAJ Irvin M. Kent, U. S. Army, for Appellant.

MAJ Edwin Doran, U. S. Army, and 1ST LT Jack J. Albert, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Higgins, pleaded not guilty to charges alleging disrespect toward a superior officer, willful disobedience of the order of the same officer, and assault and battery—in violation of the Uniform Code of Military Justice, Articles 89, 90, and 128, 50 USC §§ 683, 684, 722, respectively. An Army general court-martial sitting in Stuttgart, Germany, found to the contrary, however, and sentenced him to receive a dishonorable discharge, to forfeit all pay and allowances, and to be confined at hard labor for three years.

The convening authority halved the period of confinement, but affirmed the findings and the remainder of the sentence. Subsequently, a board of review disapproved the findings of disrespect and those of willful disobedience—for the reason that certain evidence of intoxication adduced at the trial suggested the possibility that the accused was not aware that he was dealing with a superior officer, and because the law officer failed to instruct the court that its members should consider the effect of intoxication on the former's capacity to entertain this necessary knowledge. The Acting The Judge Advocate General of the service concerned has certified to us two questions. The first inquires whether the law officer, with reference to the disrespect and disobedience charged, was

". . . required to instruct the members of the court-martial more specifically as to the effect of intoxication or amnesia upon the accused's knowledge, at the time and place of the offenses, that the person addressed and disobeyed by the accused was his superior officer?"

Since we propose to answer this question in the negative, the second certified question—by its own terms—becomes moot and demands no detailed response.

## II

On the night of January 16, 1953, the accused repaired to his company's orderly room, and entered into conversation with the duty sergeant. After determining that the accused had no valid reason for being in the room at that time, his Commanding Officer—one Captain Fitez—directed him to leave. According to Captain Fitez' testimony, the accused did not comply with the order, but instead announced his flat refusal to return to his quarters. Thereafter, in gutter language he stated: "Don't . . . with me or I'll kill you. . . . I know you are a Captain. I have killed before and I'll kill again." The Captain was in uniform at the time, was wearing the insignia of his grade, and had on previous occasions had contact with the accused.

When the latter persisted in his refusal to depart, the services of several soldiers were secured to produce by force the result which verbal persuasion had failed to accomplish. At this time the accused assaulted with a chair one of the soldiers seeking to effect his leave-taking. A Lieutenant Haines, who witnessed the episode, testified that the accused stated specifically that he knew he was addressing a Captain, and incorporated the word "Captain" in his derogatory remarks. The duty sergeant's version of the accused's statement was as follows: "Captain, I know you're a Captain and I've killed before and I'm going to kill you." The remaining prosecution witness was the soldier

who had been assaulted by the accused, and who had not entered the orderly room until after the alleged acts of disrespect had occurred.

The accused, from the witness stand, asserted that shortly before the incident he had consumed a substantial quantity of intoxicating liquor. He stated concerning the offenses: "I can honestly say that I don't remember a thing about it. I don't remember going in the orderly room." He added that "The last thing I remember that night was being downstairs at the 16th Infantry talking to a friend of mine." The accused reported receipt of a childhood skull fracture and of a head injury incurred several years before the events under consideration here. In addition he adverted to having suffered previous "blackouts" on occasion.

In light of this defense evidence, the law officer quite properly adjourned the trial to permit inquiry into the accused's mental responsibility. More than two weeks later the court-martial reconvened, at which time there was received in evidence the stipulated testimony of three psychiatrists who had served as members of a board which, during the period of adjournment, had conducted an examination into and made findings concerning the accused's mental responsibility. This stipulated testimony indicated the presence of complete mental responsibility on the part of accused and the total absence of disease. It also corroborated the accused's testimony to the extent that the medical officers found an "old, well healed fracture." However, they asserted that this was "definitely considered an insignificant finding in relationship to the present determination of mental responsibility."

### III

The first certified question inquires whether the law officer was under a duty "to instruct the members of the court-martial more specifically as to the effect of intoxication or amnesia upon the accused's knowledge" that the person addressed and disobeyed was his superior officer. We observe that the law officer, in instructing the court-martial on the offenses charged, advised its members that prerequisite to guilt of disrespect was the necessity for a finding that "the accused knew that Captain Ralph S. Fitez was his superior officer," and that as a basis for guilt of willful disobedience they must have found that "the accused knew that the command was from his superior officer."

Thereafter with reference to the possible effect of intoxication on willfulness he instructed in detail:

". . . you are advised that you may consider evidence of voluntary drunkenness in determining whether the accused had sufficient mental capacity to entertain the specific intent involved in the offense of willful disobedience. The specific intent involved in willful disobedience is a specific intent to defy authority. The fact that a person was intoxicated at the time he committed an offense does not necessarily show that he was deprived of his reasoning ability, for a person may be drunk and at the same time be aware of his acts and their probable consequences. The question raised by the evidence of voluntary drunkenness and presented for your determination is whether the accused was intoxicated to such a degree as to render him mentally incapable of entertaining a specific intent to defy authority.

"There is other evidence in this case which you properly may weigh with or against the evidence of voluntary drunkenness in determining the accused's reasoning ability, such as evidence of the accused's muscular and mental condition immediately before, during and immediately after the offense of willful disobedience; the accused's ability to speak coherently immediately before, during and immediately after this offense; the accused's inability to recognize the surroundings in which he was placed.

"In the light of the evidence, if you have a reasonable doubt that the accused was mentally capable of entertaining the specific intent to defy authority involved in the offense of willful disobedience, you must find him not guilty of that offense."

The law officer also instructed on the lesser included offense of failure to obey. Need he have gone further? We think not.

We have frequently recognized that the effects of drunkenness may be so severe as to obliterate all █ knowledge of the nature demanded in this case—and thus to remove an ingredient which is ultimately essential to a finding of guilt of the offense of disrespect to a superior officer or that of willful disobedience. See, e.g., United States v. Miller, 2 USCMA 194, 7 CMR 70. It is difficult for us to understand how a person can be so drunk as to be unable to know whom he is addressing and, at the same time, sufficiently sober as to be mentally capable of entertaining a specific intent to defy authority. A purpose to defy authority would—within the context of the case at bar—have demanded a recognition by the accused that he was addressing Captain Fitez and that the Captain was speaking to him. Accordingly, when the court-martial—after proper instructions concerning the possible effect of drunkenness on the element of willfulness—concluded that the accused had *willfully* disobeyed the order of Captain Fitez, by necessity its members must have found that he was sober enough to know that it was *Captain* Fitez who had issued the order. Moreover, having found no absence of knowledge as to the crime of willful disobedience, logically they must have found no want of the same ingredient as to the disrespect alleged to have occurred contemporaneously. United States v. Kubel, 1 USCMA 645, 5 CMR 73.

## IV

In another case we have considered at length the problem of amnesia as met in a criminal law setting, and determined that a mere claim of memory loss without more must be regarded as inconclusive. United States v. Olvera, 4 USCMA 134, 15 CMR 134. However in the instant case the amnesia was related to a claim of former skull fracture as well as to temporary, but doubtless acute, alcoholism. As to the former, it is to be noted that the medical testimony attached no significance whatever to it. With respect to the latter, it certainly served to corroborate the existence of an advanced stage of drunkenness, which would tend to raise the possibility of want of intent and knowledge. Yet we are sure that the law officer was not required because of this possibility to instruct *sua sponte* and in detail concerning the symptom, and on the inferences which may be drawn from an assertion of amnesia following the ingestion of intoxicating liquor. United States v. Olvera, supra. Actually the place to be accorded this phenomenon is a matter for court members to determine on the basis of experience and observation—for human reactions to alcohol vary enormously. We would suppose that, upon request, the law officer should instruct that amnesia, if genuine, is a circumstance that the court may consider in determining the degree of drunkenness of an accused. Cf. United States v. Biesak, 3 USCMA 714, 14 CMR 132. Here there was no such request.

Actually, however, it strikes us that the law officer's advice that the court-martial might properly consider "evidence of the accused's muscular and mental condition immediately before, during and immediately after the offense of willful disobedience" constituted an ample reference to amnesia in its relation to drunkenness. It is to be noted, too, that there was a further instructional reference to the requirement of a determination beyond reasonable doubt that the accused was *"mentally capable* of entertaining the specific intent to defy authority involved in the offense of willful disobedience." (Emphasis supplied.) In our view these directions operated to bring all of the evidence of mental aberration before the court-martial. We have no doubt that amnesia—insofar as it bears on general mental responsibility for the offenses allegedly committed—was adequately dealt with in the law officer's instructions on insanity. In this area, too, if defense counsel had thought necessary an instruction that evidence of "blackout" might be taken into account in determining legal insanity,

**147**

this should have been the subject of a specific request.

As part of a general discussion of the problem of amnesia—as distinguished from intoxication ▬▬▬ ■ —we think it necessary to observe that amnesia, plus *other evidence* of mental shortcomings, may require an instruction not only on insanity, but also on the possibility of partial criminal responsibility. In other words, we would consider that the existence of mental processes, such as intent or premeditation, necessary for conviction of certain crimes, may be negated by a showing that the accused's mind could not entertain those processes.

In this connection we are not unmindful of the United States Supreme Court's ruling in Fisher v. United States, 328 US 463, 90 L ed 1382, 66 S Ct 1318. That case involved a defendant accused of first degree murder, who had introduced evidence of "psychopathic aggressive tendencies, low emotional response and borderline mental deficiency" in an attempt to establish that he was mentally incapable of the premeditation required for first degree murder. "The aggregate of these factors admittedly was not enough to support a finding of not guilty by reason of insanity." The Supreme Court upheld a refusal to instruct that these factors might properly be used in determining whether the accused was guilty of first or second degree murder. However, it was clearly indicated that this result was reached as a matter of construction of the law of the District of Columbia by which the majority felt bound.

In the earlier case of Hopt v. People, 104 US 631, 26 L ed 873, the Supreme Court had held it error to refuse an instruction that intoxication might be considered as affecting premeditation in a murder trial. In that opinion the Court had stated that:

"... when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question, whether the accused is in such a condition of mind, by reason of drunkenness *or otherwise,* as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury." [Emphasis supplied.]

The relevant statute of the Utah Territory provided:

" '. . . whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.' "

In Fisher v. United States, supra, the majority distinguished the prior pronouncement in Hopt by pointing out that it stemmed from a specific statute. Since that statute is closely approximated by the directive provisions of the Manual for Courts-Martial, United States, 1951, paragraph 154a(2), no such distinction is available to us. Moreover, if an accused person may lessen his criminal responsibility by a showing that he was not able to entertain premeditation, intent, or knowledge due to voluntary intoxication—a condition largely within his own control, and disapproved by society and the law —we would regard as anomalous a refusal to permit a showing that premeditation, intent, or knowledge was or might be wanting due to some mental derangement—usually without the accused's control. It would seem to follow that if an accused person produces evidence of an underlying mental state, which might have served to affect his intent at the time of the acts alleged, then the law officer should advise the court that its members may properly consider the evidence of mental condition in determining the accused's capacity to entertain premeditation, intent, or knowledge—when any of these is relevant to an offense charged. However, a showing of amnesia *without more* would not necessitate such an instruction.

V

In connection with the sufficiency of

148

the law officer's instructions we must note a further basis for our holding. As previously mentioned, the law officer advised court members that, to convict of the offenses charged, they would be required to find knowledge beyond a reasonable doubt. The uncontradicted evidence of three prosecution witnesses indicated that the accused had used the word "Captain" in addressing his commanding officer. The accused could scarcely deny this fact—consistent with his story that he remembered nothing whatever of the period in question. In the posture of the evidence immediately before findings, therefore, if the court did not believe that the accused had used the word "Captain"—or some similar expression denoting rank—in addressing Captain Fitez it had no practical alternative save to acquit. The testimony of the Government's witnesses was not severable. On the other hand, if the court's members believed that the accused *had* used such an expression, we cannot understand how they could have reconciled such a determination with any sort of doubt that the accused knew he was addressing and disobeying a superior officer. Certainly the mere presence of a genuine alcoholic amnesia—according to current psychiatric teaching—would have constituted no bar to a finding of knowledge. United States v. Olvera, supra.

In light of the entire record, we entertain no doubt that the law officer did all that was required of him, and that the issue of knowledge was not reasonably raised. Cf. United States v. Wallace, 2 USCMA 595, 10 CMR 93. Having answered the certified question in the negative, the record is remanded to The Judge Advocate General, United States Army, for action not inconsistent with this opinion.

Chief Judge QUINN and Judge LATIMER concur.