UNITED STATES, Appellee

v.

THOMAS J. EDWARDS, Private E–2, U. S. Army, Appellant

4 USCMA 299, 15 CMR 299

300

No. 4355

Decided May 14, 1954

LT COL James C. Hamilton, U. S. Army, and 1ST LT Arnold H. Craine, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Roderick V. Brown, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case reaches us by mandatory appeal under the provisions of Article 67 (b) (1) of the Uniform Code of Military Justice, 50 USC § 654, because the death penalty was imposed by the court-martial and affirmed by reviewing authorities. The facts portray a shocking crime but, in view of the nature and extent of the review, it is necessary that we relate them generally. On or about March 1, 1953, at 9:30 pm, Maria Stowasser, the victim, was seen in the company of one Private Jessie D. Bell in a gasthouse, commonly called "Sophie's Place" in Kitzingen, Germany. The accused, in the company of several companions, entered the place shortly thereafter. Private Bell left the victim seated at a table in the gasthouse at or near 10:00 pm after making arrangements to meet her the following evening. Approximately one and one-half hours later, she and the accused were seen on

the street in front of the same premises.

Between 1:15 and 1:30 on the morning of March 2, 1953, Dr. Lotar Bilz, in response to a request from the police, examined the dead body of a woman, later identified as Maria Stowasser, some 80 yards from "Sophie's Place" of entertainment. The head of the corpse was lying against a stone wall. The face of the murdered woman was covered with blood, she was beaten and wounded in numerous places on her head and body, and her clothing was torn to such an extent that she was nude from the knees to the abdomen. The body was cold and in the opinion of the examining physician the victim had been dead for a period of from one to two hours.

On the afternoon of March 2, 1953, a qualified pathologist and physician examined and performed an autopsy upon the body of the same woman. He noticed the following injuries: "strangling marks on the neck . . . incised wounds, on the right frontal area from eyebrow to hair . . . effusion and hematoma on the right ear . . . lacerated wound on the lips, hematoma on the upper forearms . . . blood in the abdominal cavity . . . bleeding in the liver tissue . . . bleeding hematoma of the conjunctiva, and contusion and hematoma of the temple muscle." His examination disclosed that she had had sexual contact shortly before her death. Based on his examination, the pathologist concluded "that death was caused by strangulation possibly resulting from the use of a band or twisted piece of fabric."

An investigation of the killing commenced around 2:00 am on March 2, 1953. The accused was suspected of having committed the crime and later on the same day, after having been fully advised of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602, he dictated a statement of his version of the death struggle. The statement was typewritten, then corrected, and signed by him. Approximately one week later, after again having been advised of his rights, he furnished a supplemental statement which varied little from the previous one. When combined and stated generally, the two statements show the following: On March 1, 1953, he was in Sophie's gasthouse; he was quite drunk, having been drinking since 10:00 o'clock in the morning; at about 11:00 pm he met the victim outside the door and started talking with her; it was mutually agreed to have intercourse and they proceeded to a position near the Main River; after having completed the sexual act they started back toward the place of entertainment; when they arrived in front of that place he and the girl exchanged a few words and he started to leave; she grabbed his arm, pulled him back, and stated she was a Russian and "I ought to kill you"; she then grabbed him by the throat, he hit her and knocked her down; she got up and ran down the road; he caught up with her at the place where they had previously had intercourse; he again struck her and knocked her against a stone wall; her head hit the wall and she fell to the ground; he got down on his knees, grabbed her by the throat, and she was crying for him to let go; he told her to keep quiet and started to walk away; she called out and it sounded to him like she used the word "Woopie" which he concluded was disparaging of his race; he then returned and she was sitting on the ground; he kicked her in the side at least three times; she fell over, and he kicked her in the face at least twice; after kicking her in the face, he jumped on her and tore her clothes off to prevent her from following him; after finishing the beating he looked around to see if anyone observed what he had done; on his way to the road he noticed two people, but remained in seclusion until they had passed; after they departed, he proceeded to a taxicab stand, called a taxicab, and proceeded back to camp; he did not intend to kill her, all he intended to do was to knock her unconscious; and he was so angry at what she said that he could not stop beating her once he started.

The accused testified in his own behalf and in substance verified the details of the two statements. He, however, sought to explain some of the

302

wording found therein, but the only explanations of any importance were these: That the words "I stopped and listened to find out if she were still alive" in the statement were the words of the agent and not his; that what he intended to say was "I wanted to find out whether she was conscious or not." That he intended to state that when he finally left the presence of the victim she was "conscious and crying" and that he never intended to kill the girl, he only intended to "knock her unconscious"; He further testified that his acts were spontaneous and not premeditated; that they were the result of anger engendered by the girl calling him names which reflected on his race; and that he did not choke the girl, he pushed on her throat.

Prior to the time of trial, the accused was given a mental examination by a neuropsychiatrist and members of his staff. They were furnished the past medical records of the accused and based on those and their examination, they concluded he was legally sane. He was diagnosed as a pathological psychopathic personalty of a predominantly aggressive type.

On October 23, 1953, The Judge Advocate General of the Army requested that the accused be examined medically to determine his mental condition at the time of committing the offense. This was pursuant to a request from appellate defense counsel that accused be given an exhaustive physical examination. On December 17, 1953, a board of three medical officers submitted a report showing the accused to be sane. The conclusion reached by them was that the accused at the time of the commission of the alleged offense was so far free from mental defect, disease, or derangement as to be able concerning the particular acts charged to adhere to the right. The officer submitting a detailed portion of the report diagnosed the accused as follows:

"Character disorder, aggressive reaction, chronic, severe as shown by sudden overwhelming release of aggressive, destructive impulses, culminating in one instance with the murder of a woman, another time easily provoked fights, generally a very poor mechanism for handling aggressive feelings. An additional feature of this man's personality, which is a leading feature, is a distorted and primitive overwhelming sexual drive. This drive has been diverted at times into perverted acts. There is a definite satyriasis. Profile; S–4."

On July 15, 1953, after the board of review had affirmed the finding and sentence, appellate defense counsel requested that it retain jurisdiction until a collateral issue had been determined. At that time it appeared that an officer who sat as a member of the court had been hospitalized for a possible mental disorder approximately fifty days after the trial of the case. The board of review complied with the request, an investigation was made, the officer was examined by a psychiatrist sometime prior to October 28, 1953, and it was concluded that he was sane at the time of the trial.

There are only two errors assigned on this appeal but the paucity of assignments is understandable in view of the posture of the evidence. We will consider both of those, but in addition, we shall discuss others because a life is at stake. However, in spite of a careful search of the record, we find no error which justifies a reversal of the finding and sentence.

We first consider the question of sanity because there is a natural inclination to assume that an accused who commits a revolting crime such as is reflected by this record must be mentally unbalanced. However, there is no real issue concerning accused's mental capacity to distinguish right from wrong and his ability to adhere to the right. The medical evidence most favorable to him was that he possessed a personality which made it a little more difficult to adhere to the right. A mental capacity to adhere to the right may vary in individuals but so long as a person is able to do so he is not legally insane. To overcome that deficiency, which may arise out of moral and not mental deterioration, a person might be required

to exercise more self-discipline, but that alone does not legally excuse the commission of a crime.

In this part of our discussion we are talking about insanity as a defense to the charge and all included offenses. We will later consider whether the issue of partial responsibility was raised reasonably by the evidence and determined by the court-martial. Restricting our present discussion █ cussion to the total defense of mental incapacity, we have little difficulty in finding that that issue was not reasonably raised by the evidence. The law officer concluded otherwise and we commend him for so doing, as he took a view of the evidence beneficial to the accused. Based on his belief that the court-martial was required to consider the sanity of the accused, he instructed appropriately on that issue.

The finding of the court-martial that accused was sane is supported by the evidence and is buttressed by a subsequent finding of a medical board while the cause was pending before the board of review. As previously stated, that appellate agency, and The Judge Advocate General of the Army, pursuant to a request of defending counsel, afforded the accused an additional opportunity to have his sanity determined, albeit, it was without success to him. The second board concluded the accused was sane, and the board of review affirmed the finding and sentence. The issue has thus been determined adversely to the accused by two fact-finding agencies, and we must affirm.

The next assignment of error is that the conviction must be reversed as the record is insufficient to support a finding of deliberation and premeditation. The argument in support of this assignment proceeds on the theory that while the medical evidence does not establish legal insanity, it nevertheless establishes that accused's mental and emotional qualities were of such a level, at the time of the crime, that he was incapable of deliberating and premeditating. To support this assignment, the accused relies on the views expressed by the dissenting Supreme Court Justices in

**304**

Fisher v. United States, 328 US 463, 90 L ed 1382, 66 S Ct 1318. The majority opinion, in that case, seems to skirt the contention advanced by the accused although it affirms a death sentence when an instruction setting out a theory that mental deficiencies not amounting to insanity could be weighed in determining premeditation.

In the recent case of United States v. Higgins, 4 USCMA 143, 15 CMR 143, we considered both the defense of partial mental responsibility and the holding in the Fisher case. There we said:

"As part of a general discussion of the problem of amnesia—as distinguished from intoxication—we think it necessary to observe that amnesia, plus *other evidence* of mental shortcomings, may require an instruction not only on insanity, but also on the possibility of partial criminal responsibility. In other words, we would consider that the existence of mental processes, such as intent or premeditation, necessary for conviction of certain crimes, may be negated by a showing that the accused's mind could not entertain those processes.

"In this connection we are not unmindful of the United States Supreme Court's ruling in Fisher v. United States, 328 US 463, 90 L ed 1382, 66 S Ct 1318. That case involved a defendant accused of first degree murder, who had introduced evidence of 'psychopathic aggressive tendencies, low emotional response and borderline mental deficiency' in an attempt to establish that he was mentally incapable of the premeditation required for first degree murder. 'The aggregate of these factors admittedly was not enough to support a finding of not guilty by reason of insanity.' The Supreme Court upheld a refusal to instruct that these factors might properly be used in determining whether the accused was guilty of first or second degree murder. However, it was clearly indicated that this result was reached as a matter of construction of the law of the District of Columbia by which the majority felt bound."

At the pressing insistence of appellate

defense counsel and out of an abundance of caution, we shall view this case solely through the spectacles of the dissenting members of the Supreme Court in Fisher, supra. The view therein expressed, most favorable to the accused in this case, is that an instruction should have been given by the law officer sua sponte informing the court members that they might consider evidence touching on the accused's mental condition in determining his capacity to premeditate. We have previously stated that a person's mental state, even though he is not insane, may be such that he is unable to premeditate. United States v. Higgins, supra. However, mere loss of moral restraints leading to a surrender to criminal tendencies will not destroy premeditation. We must, therefore, consider the concepts announced in light of the factual background. There are many differences between the facts of this case and those related in Fisher, supra. We are not here dealing with the facts of that case nor a theoretical problem; we are dealing with the accused and the individualized facts of this case. It is in the light of this record that we must determine whether a general mental impairment rendering accused incapable of premeditating was raised, and, whether or not the instructions given by the law officer met minimal standards to require the court-martial to consider that possibility. In this instance, there is no evidence to the effect that accused was suffering from a deranged mental condition which would prevent him from resisting an impulse to kill the victim. The medical evidence which confronts us is that the accused was of average intelligence, he was able to adhere to the right, and that, even though he possessed a psychopathic personality, his condition was not such as to lessen his responsibility for the crime committed. In Fisher, supra, medical evidence established that a deranged mental condition rendered the defendant unable to resist the urge to kill the victim. The defendant's acts and conduct were described as those of a man of primitive emotions reacting to the sudden stimulus of insult and proceeding from that point without purpose or design. His was a very low grade of mentality and no motive could be found in that record to account for the killing except imputations implicit in the expressions used by the victim. Here the accused had an average mentality, but he possessed an insatiable desire for sex satisfaction, and the killing occurred at the spot where the sexual act occurred. It is a fair inference that a motive for the crime could have arisen out of the sex abnormalities of the accused and his desire to force his attentions on the victim. Aside from that difference, the opinion of all the medical officers who examined the accused was that he could plan to commit an offense, and that he had the mental capacity to know it was wrong and to resist its commission, had he attempted so to do. If their conclusions are accepted, then accused had the capacity to premeditate.

The stories related by the accused support the conclusion that he was mentally able to premeditate even though his statement given on the day of the crime mentions three factors which might affect his capacity to do so. The first is his possible intoxication. The second is that the victim had informed him that she was a Russian, she made deprecatory remarks casting reflection on his race, and these statements angered him. The third is that she had threatened to kill him and he was infuriated. We shall deal with intoxication later in this opinion and we can brush aside self-defense as it has never been seriously contended that accused needed to kill to protect himself. The second factor includes heat of passion and while, if it existed, it might affect accused's ability to think out beforehand, his testimony shows no adequate provocation. Furthermore, that issue was resolved by the finding under appropriate instructions.

In support of his contention that his mental derangement precluded him from premeditating, accused argues the victim angered him and because of this, he lost control of himself. However, his statements fail to picture a sudden impulse which so beclouded and confused his mind that he knew not what he was doing. Rather they portray a

**305**

mental capacity to reason step by step from the initial assault to the last beating. He thought out many things, including ways of avoiding detection, during the time when the loss of reasoning power would be the greatest. It must be remembered that the evidence in this case shows the woman was strangled by the use of a band or twisted fabric. The accused fails to mention the use of anything but his hands, but if a choking device was used, some thought must have been given to its use. Moreover, accused remembers how he chased the victim, knocked her head against the wall, got down on his knees, grabbed her throat with his right hand, and held her right arm with his left hand. Furthermore, after giving her the first terrific beating, he recalls walking away and when she called out something to him, he returned, kicked and beat her further, and then tore off her clothes so that she could not follow him. He then made observations to determine if anyone could have detected him committing the crime. He noticed two persons near the scene and concealed himself until he could leave in safety. When that time arrived he left his hiding place, hailed a taxicab, and returned to camp. Without some medical evidence to the contrary, we cannot conclude that a person who can cerebrate to that extent cannot premeditate in taking a life. In addition, it may be that a person operating under some form of mental derangement not amounting to insanity could brutally murder another and not be able to consciously and premeditatively intend to kill; but if so, he would not be able to form an intent only to beat the victim into insensibility. We realize the presence of a twilight zone between sanity and insanity, but this record shows the accused as possessing a mental condition of such capacity as to place him in the category of those persons who are sane and who have the capabilities of premeditating.

This brings up the questions of the instructional framework. The law officer in his instruction covered the law of the case and particularly did not leave the area of premeditation untouched. While he did not isolate the mental

condition of the accused and its effect on premeditation, he did inform the court-martial that a murder was not premeditated unless the thought of taking a life was consciously conceived by the accused and the act by which the life was taken was intended. Whatever mental deficiencies the accused possessed were presented to the court-martial for consideration and the law officer stated that if, in the light of all evidence, the court members had a reasonable doubt that the accused was mentally capable of entertaining a premeditated design to kill, he must be found not guilty of the crime of premeditated murder; and, that if the members had a reasonable doubt that he was mentally capable of entertaining an intent to kill or inflict great bodily harm, it could not find him guilty of unpremeditated murder. When considered in the light of this record, we believe the instructions meet minimal requirements for the issue of premeditation.

Included in the statements given by the accused is an assertion that he was intoxicated. The law officer assumed that was sufficient evidence to raise an issue as to that defense. In view of the ability of the accused to relate his acts and conduct in detail during the whole course of the evening, including those resulting in the killing, we have some doubts about the issue being raised. Again, the law officer acted wisely in permitting the court-martial to consider the defense. He appropriately instructed the members of the court-martial that there was evidence of voluntary drunkenness and that the evidence raised a question of accused's capacity to entertain a premeditated design to kill. This was one of the elements the court-martial was directed to consider when deliberating on accused's capacity or lack of capacity to premeditate, and his capability of forming a specific intent to kill. We find no complaint of importance on this issue.

The law officer instructed on voluntary manslaughter as an included offense. He defined the offense and directed the members of the court-martial that if they found the killing

306

was done in the heat of sudden passion, caused by adequate provocation, the crime would be no more than voluntary manslaughter. The authorities are legion to the effect that mere words are not sufficient to constitute adequate provocation and the only fact we find in this record which remotely supports accused's contention that he killed in the sudden heat of passion was that the victim had stated she was a "Red" and that she had called him a "Woopie." Obviously, these statements are not sufficient provocation to compel a finding of manslaughter.

One other question bears mentioning. At the trial Lieutenant Colonel Roy H. Hurst was challenged for █ cause. The facts used to support the challenge were substantially these: The officer testified that in his official capacity as Provost Marshal, he had received the initial report relative to the death of the victim from accused's unit. He forwarded it to Seventh Army Headquarters in the usual and customary manner. The extent of the report was that a soldier had beaten a woman to death and the accused was suspected. In addition, he received a report over the telephone that the accused had beaten a woman to death which he relayed to the Chief of Staff. We find no error in the court denying the challenge. There are certain assignments in the military which require officers to handle routine reports. A Provost Marshal undoubtedly handles many communications dealing with the commission of crimes. It was in connection with his official duties that Colonel Hurst forwarded the preliminary report to Seventh Army Headquarters and notified the Chief of Staff of the Division. He acquired no information other than that a woman had been killed and that the accused was suspected. He would know that much by virtue of his membership on the court. He made no investigation, and, at the time of trial, he had not formed an opinion as to the guilt or innocence of the accused. He had no interest in the outcome of the litigation other than to perform his duties as a member of the court-martial, and he was not prejudiced for or against the accused. The most that can be said in favor of the accused's contention is that the Colonel had prior to trial received some information concerning the offense. Standing alone, that is not sufficient grounds for challenge for cause. Similar contentions have been considered and overruled by us in United States v. Shaffer, 2 USCMA 75, 6 CMR 75, and United States v. Stewart, 2 USCMA 78, 6 CMR 78.

The imposition of the death penalty requires unanimous vote of all members of the court-martial and the █ board of review considered the possibility of one member being disqualified because of the lack of mental capacity. As previously stated, while the case was pending before the board of review, one member of the court-martial was hospitalized for a mental disturbance. Evidence was taken to determine his mental condition at the time of trial. Expert medical testimony and statements from other members who sat on the court disclosed no disqualification existing at that time. Error cannot, therefore, be based on that ground.

We have searched the record for other possible errors and if there are any, they are not considered of sufficient importance to justify consideration. The accused was tried fairly and justly, and given all the protection accorded to him by the Uniform Code of Military Justice. The record discloses a cruel and brutal killing, without excuse or justification, and the finding and sentence must, accordingly, be affirmed.

Chief Judge QUINN and Judge BROSMAN concur.