UNITED STATES, Appellee

v.

CHARLIE R. STOKES, Sergeant, U. S. Marine Corps, Appellant

6 USCMA 65, 19 CMR 191

No. 5747

Decided June 24, 1955

CDR Benjamin H. Berry, USN, and CDR William T. Roddy, USN, for Appellant.

CDR George H. Rood, USN, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused—a Marine sergeant assigned to military duty in Korea at the time of the commission of the offenses alleged—was tried by general court-martial and convicted of absence without leave, in violation of Article 86, Uniform Code of Military Justice, 50 USC § 680; assault with a dangerous weapon, in violation of Article 128, Uniform Code, 50 USC § 722; and unpremeditated murder, in violation of Article 118, Uniform Code, 50 USC § 712. All findings, together with the sentence to dishonorable discharge, total forfeitures, and confinement at hard labor for twenty-five years, were approved subsequently by the convening authority. After affirming the findings, a Navy board of review halved the period of confinement approved below, but otherwise affirmed the sentence. We granted review to test the sufficiency of the law officer's instructions.

II

On the afternoon of November 22, 1953, Stokes and a friend were drinking native wine in a Marine squadbay at Ascom City, Korea. After more than a dozen bottles had been consumed by the pair, they were joined by two soldiers—an acquaintance of the accused named Johner, and a Corporal Self, whom Stokes had not met before. At approximately nine o'clock that evening, Self, Johner and the accused entered the front seat of a "jeep," and proceeded to an Army compound some two miles distant. During the drive, the accused drew and flourished a .45 caliber pistol, but at Johner's insistence returned it to his belt. When the vehicle arrived at the compound, Self, who was on duty as Corporal of the Guard, was joined by his relief—a Corporal Shrum—and an unidentified Korean sentry. In order to seat the two additional riders, the accused and John-

**67**

er placed themselves in the rear of the "jeep" with the former located on the left side. Shrum, Self and the Korean were seated in front, Self between the other two. Johner then requested Corporal Self to join himself and the accused in the back seat. Although Johner had been unaware that the accused had once more removed the pistol from the top of his trousers, as the former observed Self to place his hands on the rear of the front seat and turn in a leftward direction, the accused squeezed its trigger and the weapon flashed. Acting instantly, Johner thrust the accused's arm downward as the latter fired a second round, removed the .45 from his grasp, and struck him on the head with its butt. An examination of Self disclosed a bullet wound near his right shoulder. He died later as a result of gunshot injuries. Approximately two minutes after the incident, the accused left the jeep, inquiring "Who shot who?"—and almost immediately lapsed into sleep or unconsciousness on a stretcher brought to the scene by medical corpsmen.

At midnight the accused, unsteady physically and without capacity to speak clearly, was transported by ambulance from a medical station in Ascom City to a Marine hospital ship at Inchon. En route, he was informed by a member of the Criminal Investigation Detachment that he would no longer have need for his identification card "because you killed a man." Following this remark the accused asked repeatedly, "Is this true," and exclaimed, "I can't believe it." On the basis of a laboratory examination accomplished some four hours after the shooting— and showing the presence of substantial quantities of alcohol in the accused's blood—a medical officer concluded that the latter had not been in full possession of his faculties at the time of the wrongful act.

At the trial, the law officer instructed appropriately on the elements of both premeditated and unpremeditated murder, but did not charge with respect to lesser degrees of homicide. The instructions included a reference to the theory that the performance of an act inherently dangerous to others may support a finding of unpremeditated murder—provided the conduct reflects a wanton disregard of human life, characterized by heedlessness of probable consequences or indifference that death or great bodily harm may ensue. We granted the accused's timely petition to determine whether the law officer should have charged on additional lesser offenses, and whether the instruction, seeking to define an inherently dangerous act in terms of "heedlessness" and "indifference," was correctly put.

### III

Appellate defense counsel have urged with vigor that both involuntary manslaughter and negligent homicide were raised by the evidence offered at the trial. We are convinced that the conduct of the accused clearly involved more than the simple negligence which constitutes the basis for the latter offense. Therefore, we shall limit our inquiry to the possibility that involuntary manslaughter was reasonably raised, and thus should have been the subject of an instruction. As the first step in this inquiry, we must determine the import of Article 118(3) of the Code.

This provision is, in one sense at least, an innovation—for in Article of War 92, 10 USC § 1564, no more than a bald reference to murder is to be found, and no effort to define the elements of that offense was made. However, preCode Manuals had sought to implement this legislation and, *inter alia,* had included discussions of the term, "malice aforethought." In one of them it was explained that this term

". . . may mean any one or more of the following states of mind preceding or coexisting with the act or omission by which death is caused: An intention to cause the death of, or grievous bodily harm to, any person, whether such person is the person actually killed or not (except if death be inflicted in the heat of a sudden passion, caused by adequate provocation—see 180a) ; *knowledge that the act which causes death will probably cause the death of, or grievous bodily harm to, any person,*

*whether such person is the person actually killed or not, even though such knowledge be accompanied by indifference whether death or great bodily harm is caused, or by a wish that it may not be caused."* [Emphasis supplied. Manual for Courts-Martial, U. S. Army, 1949, paragraph 179a, page 231. *Accord:* Manual for Courts-Martial, U. S. Army, 1928, paragraph 148a, pages 163–4; Manual for Courts-Martial, U. S. Army, 1921, paragraph 442, pages 410–1. Cf. Naval Courts and Boards, 1937, sec. 53, page 23.]

A careful study of the legislative hearings with respect to the Uniform Code makes clear that, in enacting Article 118, Congress intended no fundamental change in the previous definition of malice aforethought. As we commented in United States v. Craig, 2 USCMA 650, 10 CMR 148, "All we believe that was intended was to separate the different states of mind so as to be more easily dealt with in the trial of cases." Accordingly, we expressed in that case our conclusion that Article 118(3) was intended to correspond to the portion italicized in the above quotation from paragraph 179a of the 1949 Manual—in which it is stated that knowledge that the act, which in fact produced death, would probably serve to cause death or grevious bodily harm to any person, is sufficient to constitute malice aforethought.

What does the 1951 Manual for Courts-Martial have to say on the subject? Its wording—used by the law officer as a basis for his instruction in the instant case—is as follows:

> "*Act inherently dangerous with wanton disregard of human life.—* Engaging in an act inherently dangerous to others, without any intent to cause the death of, or great bodily harm to, any particular person, or even with a wish that death may not be caused, may also constitute murder if the performance of the act shows a wanton disregard of human life. Such disregard is characterized by a heedlessness of the probable consequences of the act or omission, an indifference that death or great

bodily harm may ensue. Examples might be throwing a live grenade toward another in jest, or flying an aircraft very low over a crowd to make it scatter." [Manual, supra, paragraph 197f.]

It has been suggested that the discussions of substantive offenses found in the Manual for Courts-Martial should be ignored by us in arriving at the meaning of a punitive article of the Code. However, on frequent occasions we have given substantial weight to the interpretations accorded Code provisions by the draftsmen of the Manual. See, e. g., United States v. Johnson, 3 USCMA 709, 14 CMR 127; United States v. Hemp, 1 USCMA 280, 3 CMR 14. Cf. United States v. Biesak, 3 USCMA 714, 14 CMR 132; United States v. Littrice, 3 USCMA 487, 13 CMR 43 (concurring opinion).

Moreover, we believe that it was the intendment of Congress that such Manual interpretations be given weight. Article 36, 50 USC § 611, provides that the President may prescribe "procedure, including modes of proof" for trials by court-martial. It is—it strikes us—distinctly arguable that the phrase "modes of proof" was designed to include discussions of the punitive articles of the Code—such as those found in the 1949 Manual, and previous editions, having to do with similar sections of the Articles of War. It is notable, too, that the phrasing of Article 36 of the Code is almost identical with that of Article of War 38, 10 USC § 1509—under the authority of which the 1949 Manual was promulgated. It is unlikely, indeed, that, if Congress had desired to limit the President's rule-making power, it would have employed the language now found in Article 36.

During Senate hearings on the Uniform Code a question arose concerning the meaning of Article 88, 50 USC § 682, having to do with contempts directed against certain officials. At that time Felix Larkin, Esquire—one of the Code's principal draftsmen—read verbatim the entire discussion of Article of War 62, 10 USC § 1534, contained in the 1949 Manual for Courts-Martial,

**69**

which legislation proscribed similar behavior. After quoting this military interpretation, Mr. Larkin noted: "I assume that kind of a construction would appear again in the manual which must be written to implement this whole thing, you see." Hearings before the Senate Committee on Armed Services, 81st Congress, 1st Session, on S. 857 and H.R. 4080, page 333. Certainly this remark anticipated the promulgation of a new Manual which would include discussions of punitive articles —and which presumably were not to be treated as nullities by military tribunals or by this Court.

It was with an eye to the importance of the forthcoming Manual that Congress required that all rules and regulations made in pursuance of Article 36 "be reported to the Congress." And a similar provision had appeared in Article of War 38. During House hearings it was emphasized that the new Manual "will come to Congress," and that "the Congress will have an opportunity to scan" the rules and regulations provided by the President. Hearings before the House Committee on Armed Services, 81st Congress, 1st Session, on H.R. 2498, pages 1015, 1063. This constitutes an additional circumstance which renders it appropriate that we do not deny an ear to the language of the Manual.

Nevertheless, in instances of conflict, it is manifest that a Manual passage must give way to the Code. See, e. g., United States v. Rosato, 3 USCMA 143, 11 CMR 143; United States v. Greer, 3 USCMA 576, 13 CMR 132. Here, as we have seen, it seems clear that Article 118(3) must be construed to adopt for the most part the discussions of malice aforethought found in the 1949 Manual for Courts-Martial and in its predecessors. To the extent, therefore, that the treatment found in paragraph 197*f* of the 1951 Manual is inconsistent with the provisions of earlier Manuals— ones requiring knowledge that death or grievous bodily harm is a probable consequence of the act—the current exposition of Article 118 (3) must be considered invalid.

70

Examining paragraph 197*f*, we discover a reference to "probable consequences" of an act. We believe that this accords with the statement of earlier Manuals to the effect that the act in question must be one which would *probably* result in death or grievous bodily harm. However, is the requirement that the accused have *knowledge* of those probable consequences spelled out in the present Manual? The crucial words are "disregard," "heedlessness," and "indifference." "Disregard"—a term also used in the Code itself—does, we are sure, import knowledge of probable consequences accompanied by a lack of concern therefor. The remaining words are consistent with, on the one hand, a lack of knowledge of probable consequences and, on the other, a knowledge of those consequences but an absence of worry or concern about them —that which, in the vernacular, might be termed a "so-what" attitude toward probable results.

In short, the situation here resembles that found in United States v. Biesak, supra. There we were required to deal with an instruction which was predicated on certain language of the current Manual for Courts-Martial. Our conclusion was that the wording involved was ambiguous, but not manifestly erroneous. This same conclusion we reach with respect to the phrasing of paragraph 197*f* before us here.

IV

One other difficult facet of the problem of definition is before us—that concerned with drunkenness. It will be observed that we have construed Article 118(3) to require a knowledge of probable consequences. In dealing with other offenses which require certain types of knowledge, we have concluded that such knowledge might well be precluded by drunkenness. See, e. g., United States v. Miller, 2 USCMA 194, 7 CMR 70; United States v. Higgins, 4 USCMA 143, 15 CMR 143.

However, we are barred from taking a similar position here by the reasoning of United States v. Craig, supra.

There Judge Latimer spoke for a unanimous Court as follows:

". . . If, for illustrative purposes, we assume that an accused is charged under a specification alleging premeditated murder and the facts permit a finding of a premeditated design to kill, and also permit a finding that the killing occurred as a result of an act which was inherently dangerous to others, the law officer might be faced with this unusual situation if intoxication was in issue. He would be required to instruct the court that it could be considered in determining whether the accused could form a specific intent; and if he could not, the crime could be reduced from premeditated murder to manslaughter unless there was also involved the lesser offense of unpremeditated murder arising out of doing an act inherently dangerous to others and in that event it could not be reduced below unpremeditated murder. We may not see clearly all the implications, but to have the offenses leap-frogging each other would make applying of the act and instructing the court a confusing and uncertain business. On the other hand, to permit intoxication to be considered only for the purpose of reducing premeditated murder to ordinary murder would make less complicated the difficult problems encountered."

It will be recalled, too, that the Craig case followed the interpretation of Article of War 92 laid down in United States v. Roman, 1 USCMA 244, 2 CMR 150—so that it must be assumed that a similar view would have been taken in interpreting the term, "malice aforethought," under the immediate predecessor to Article 118 of the Uniform Code. In short, then, drunkenness is viewed in military law as having no sort of bearing on malice aforethought—whether under 118 (2) or 118 (3). Accordingly, it cannot operate to negate that knowledge of probable consequences which is required for conviction under Article 118.

Perhaps it will be said that "knowledge" is no more than fictive, once it is conceded that an accused is thoroughly intoxicated. If so, suffice it to say that we are committed to this legal fiction by the Craig case. It may be added that intent or malice may be equally supposititious if an accused is very drunk. Yet it appears that voluntary drunkenness—not amounting to legal insanity—will not in military law negate that general criminal intent, the malice, required for a conviction of unpremeditated murder. United States v. Craig, supra. In this regard military law accords happily with the common law. See United States v. Bishop, 107 F2d 297 (CA DC Cir).

V

Applying to the record of trial before us the principles of the preceding paragraphs, we are sure the present conviction must be affirmed. While located within the confines of a small vehicle—one occupied by five persons—the accused discharged a .45 caliber pistol in the direction of the front seat, in which the victim and two acquaintances sat. True, he appeared to bear no ill will toward the deceased, nor had he a discernible reason for firing the weapon. However, to have done so in such quarters revealed indisputably a wanton disregard by the accused for the lives of those riding in the automobile. United States v. McDonald, 4 USCMA 130, 15 CMR 130.

We must emphasize the fact that, shortly before the tragic episode with which we are concerned, the accused had drawn a pistol—which, incidentally, he was carrying without authority—and had been expressly directed by Sergeant Johner to desist. Although we were to assume unrealistically that the accused—a Marine sergeant with five years' service—was unaware of the death-dealing power of the weapon, he was certainly placed on notice of its dangerous quality by Johner's warning. Thus, when he brandished and fired the arm a second time within a small and crowded vehicle in which four other persons were being carried, it is clear that he acted with reckless indifference toward human life.

Appellate defense counsel—relying

on the testimony of certain witnesses who spoke of the accused's want of sobriety—insist that his possible intoxication served to place involuntary manslaughter in issue. As we have previously noted, however, the Craig decision leaves us no alternative to a holding that intoxication is irrelevant now—the accused having been found free from premeditation. Thus, we need only inquire into what issues would have been raised had the accused been wholly sober at the time of the homicide. In such event—even absent the express warning of his fellow passenger, Sergeant Johner—the possibility that he lacked knowledge of the probable consequences of firing the weapon might well be deemed not to have been reasonably raised. However, in light of Johner's undisputed testimony that he had directed the accused to lower the pistol, there can be no slightest doubt that lack of knowledge was not in issue—if, as is the case, drunkenness must be disregarded. Our inescapable conclusion is that the law officer did not err in omitting to charge on involuntary manslaughter.

## VI

It is suggested that the law officer's charge with respect to Article 118 (3) of the Code constitutes reversible error. Those instructions were put in the language of paragraph 197*f* of the 1951 Manual which—as we have observed—is ambiguous. However, no complaint of ambiguity was entered by defense counsel, and no request for clarification was made. Therefore, the instruction may not properly be availed of here as a basis for reversal. United States v. Biesak, supra.

A further difficulty is posed by an example used in the law officer's instructions in explanation of Article 118 (3). To this end he suggested that a motorist, regardless of sobriety, who drove his vehicle into a defined area—one in which numerous pedestrians were gathered together—and killed one of their number, might properly be found guilty of unpremeditated murder. In phrasing this illustration, the law officer

omitted reference to the need for knowledge on the part of the perpetrator that his act would probably cause the death of, or grievous bodily harm to, a person or persons. While it must be obvious that the illustration, only one of several, might have been phrased more carefully, we are unconvinced that the instruction of which it was an element —when read fairly as a part of the whole—reached the level of prejudicial error.

In the first place, in its language the law officer did not exclude specifically a knowledge of probable consequences—so that his instruction in that respect suffered merely from the ambiguity which characterizes paragraph 197*f* of the Manual. And our previous comments on the defense's failure to request clarification are equally apposite here. Secondly, the law officer's failure to elaborate on knowledge is of much less significance where, as here, it unquestionably existed—unless, indeed, it be assumed that the accused was too deeply intoxicated to possess such knowledge. In the latter event, however, the evidence of drunkenness must, under the doctrine of the Craig case, be excluded from consideration. Thus, there remains no issue of intoxication. In light of the issues actually before the court-martial here, we are sure that the instructions supplied by the law officer constituted an adequate framework within which the court-martial might fairly pass on guilt. If the defense counsel at the trial thought further elucidation necessary, he should have requested it.

## VII

The decision of the board of review must be and is affirmed.

Chief Judge QUINN concurs in the result.

LATIMER, Judge (concurring in the result):

I concur in the result.

I file this concurring opinion because I find in Judge Brosman's approach a view concerning knowledge which causes me some doubt. Therefore, I prefer to support his result by a process of reasoning which takes a differ-

ent course. In the end I agree with his conclusion that intoxication, not amounting to legal insanity, is not a defense to a crime alleged under Article 118 (3) of the Uniform Code, 50 USC § 712.

This case places squarely on our shoulders the duty to distinguish the type of murder found in subsection (3) from those found in the other three subsections of Article 118 of the Code. Because that Article breaks with the past, and because we have an opportunity to chart a new course in the murder field of military law, I believe it of little importance that the reasons for our holding may not be supported by some of the principles found in previously decided cases. We are not given any guideposts by the legislative history or by the Congressional hearings, and so I am free to construe the punitive article without fear of impinging on previously expressed views.

For the purposes of this development, I purposely do not consider felony murders at length as they are a species peculiar to themselves. I do, however, believe they offer no obstacle to my concepts. In most jurisdictions where an enactment similar to the one which confronts us has been interpreted to include subjective knowledge of the act, or its probable consequences, as an element of the offense, the crime has been catalogued by the statutes as first degree murder. The theory which might be involved in those cases seems to me to be founded on the concept that a universal malice is present in the mind of a person who commits a wanton act which is in utter disregard of human lives. The malice toward many present in that situation can be considered as a statutory substitute for the premeditation necessary in premeditated murder and it is arguable that that is the reason the legislatures have placed the crimes upon the same level. Some authorities have used a similar principle to support felony murders as capital offenses, that is, the felony supplies the malice. See United States v. Davis, 2 USCMA 505, 509, 10 CMR 3. However, the offense defined by Article 118 (3) carries a lesser penalty than either premeditated or felony murder, and the framers of the code must have had some good reason to drop that particular type of murder down to a degree lower than those killings which are deliberately planned or thought out or are committed while perpetrating certain crimes. The only recognizable ingredient which I find has been dropped is either the premeditated design to kill or its substitute. Of course, a person could premeditate on the killing of more than one person and thus bring himself under subsection (1) of the Article, but if that ingredient were absent he, nevertheless, could be found guilty of the lesser included offense of unpremeditated murder defined in subsection (3). Many examples have been cited in decided cases showing application of this rule, and I refer to one. If we suppose an accused premeditatedly threw a live bomb into a crowd intending to kill all, he could be found guilty of premeditated murder. However, if the prosecution failed to show facts from which premeditation could be inferred, only a conviction for unpremeditated murder could be sustained. In this supposititious case, intoxication could neutralize premeditation and we would drop to the level of Article 118 (3).

So far no difficulty is encountered, but the hurdle to overcome is found in the question as to whether actual knowledge of the act or its probable consequences must be established to support a finding under subsection (3). In considering the forms of unpremeditated murder and the effect of intoxication which, of course, embraces lack of knowledge, I find a good analogy can be worked out between the second and third subsections of Article 118. Pretermitting felony killings, at the top of the degrees of murder are those crimes supported by premeditation. Directly below in one degree are the offenses defined by subsections (2) and (3). In certain respects, the two lesser degrees bear comparison. In the former, the intent to inflict great bodily harm is directed toward one individual, while in the latter, the act is bottomed on behavior directed toward, and committed in utter disregard for, the lives of more than one. This is the

**73**

principle we have expounded in United States v. Davis, supra, and United States v. Holsey, 2 USCMA 554, 10 CMR 52. In the first category, malice toward one may be found in the brutal and callous means employed to forfeit his life. In the second class, universal malice is predicated on the utter disregard for the lives of others by one whose mind has reached such a depraved condition that he cares not who, or how many, may be killed. If it is possible to rationalize generally on the heinousness of the two types of unpremeditated murder, I would say unhesitatingly that the offense defined by subsection (3) is the gravest. However, for the purposes of this case, I need go no further than to leave them on the same plane where, for all practical purposes, they have been placed by Congress.

As pointed out by Judge Brosman, we have permitted voluntary intoxication to be considered as affecting the capacity to premeditate and thus premeditated murder can be reduced one degree. But when the act involved only one person, we refused to permit that mental condition to reduce further the offense. A fortiori, we should not permit voluntary intoxication to reduce the degree of the offense when the lives of many are placed in jeopardy. To do otherwise would bring about this absurd result. A person with a malignant heart who kills in utter disregard of the life of one individual could not, by establishing intoxication, have his crime reduced below unpremeditated murder. Yet the same person, if he performed a much more savage act in disregard of the lives of many, could, by establishing that defense, reach the lower degrees of homicide. As a matter of sound statutory construction, a punitive article should not be construed by us to bring about such a ridiculous result.

· Another reason which seems to argue in support of the result we reach is this. This particular type of offense can be classified in a general category with negligent homicide, involuntary manslaughter, and unpremeditated murder based on doing an act with intent to do great bodily harm. Each is based on some transgression which is a departure from the norms of society. Furthermore, none of them requires a specific intent to kill, as the perpetrator may have a fixed intention not to bring about a death. A conviction of negligent homicide is supported by an act involving ordinary negligence. Involuntary manslaughter is founded on a delict which is grossly negligent. A finding on one form of second degree murder can be supported by misbehavior perpetrated with a general intent to do great bodily harm to one individual. Finally, the offense in this case is founded on an act which is inherently dangerous to others and evinces a wanton disregard for the lives of more than one. I have traversed the scale from the lowest degree to one second from the top, and, pretermitting for the moment this particular type, the ingredient of actual knowledge is not required in any. Viewed in that light, if knowledge be considered as a necessary predicate to support a conviction for those offenses, it is of the objective type, and I find no good reason to set up a different rule to be applied in this instance. Accordingly, the net of my argument is that the knowledge required to support this form of offense need be no more than constructive. Converted to the facts of this case, and stated in more familiar language, my rule is this: If the accused knew, or should have known, if sober, that he was firing a weapon while it was pointed toward a group of soldiers crowded in a quarter-ton truck, he is guilty of unpremeditated murder.

One further argument can be advanced to buttress my concept. Reverting back to the allied offenses, and the law as we have previously announced it, it necessarily must be concluded that voluntary intoxication cannot possibly be a defense to negligent homicide, involuntary manslaughter or the unpremeditated murder of one victim. As a matter of law, it can be one of the negligent acts upon which the Government relies to prove either of the two first mentioned offenses, and I fail to see why the same logic would not make it relevant as proof of wantonness in this offense. Intoxication is quite often a means by which the mind of

the perpetrator is dulled or steeled to aid him in doing an act in utter disregard for human lives. Throwing live grenades, firing into crowds, shooting into occupied tents, and other forms of savagery, are in many instances the product of a mind affected by intoxicants. Of necessity, when those events occur, death usually ensues. Would it not, therefore, be paradoxical to hold that a sober man would be criminally liable for an aggravated homicide if he tossed a lethal bomb into a crowd, while one who rendered himself mentally unable fully to appreciate the death dealing quality of the missile would be guilty of a lesser form?

It is obvious that the same argument can be made in the field of premeditated murder. We have acknowledged that possibility in previous cases, but we also recognized that there was a limit beyond which intoxication could not be used as a defense. The law has seen fit not to permit capital punishment to be imposed on an accused who because of intoxication does not have the capacity to premeditate. That rule is recognized in military law and has been enforced by us. However, most authorities stop at the level of unpremeditated murder as did we in United States v. Craig, 2 USCMA 650, 10 CMR 148. In that connection it is to be noted that the Manual for Courts-Martial, United States, 1951, provides:

". . . It is a general rule of law that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition; but such drunkenness may be considered as affecting mental capacity to entertain a specific intent, or to premeditate a design to kill, when either matter is a necessary element of the offense." [Paragraph 154a(2).]

The division may be arbitrary but it is supportable and it marks the boundary beyond which I am prepared not to go. Here, premeditation is not a necessary ingredient of the crime, and the knowledge I believe to be involved is not influenced by the state of intoxication. I, therefore, concur in the result.