UNITED STATES, Appellee,

v.

Ralf E. JACKSON, Senior Airman
U.S. Air Force, Appellant.

No. 68,114.
CMR No. 29011.

U.S. Court of Military Appeals.

Argued June 3, 1993.

Decided Sept. 28, 1993.

Certiorari Denied Feb. 22, 1994.

See 114 S.Ct. 1056.

For Appellant: *Captain David D. Jividen* (argued); *Colonel Terry J. Woodhouse* (on brief); *Lieutenant Colonel Frank J. Spinner* and *Major Mary C. Yastishock.*

For Appellee: *Captain Jules D. Silberberg* (argued); *Colonel Richard L. Purdon, Lieutenant Colonel Jeffery T. Infelise, Captain David C. Wesley* (on brief); *Major John H. Kongable.*

### Opinion of the Court

GIERKE, Judge:

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of wrongfully using marijuana, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The approved sentence provides for a bad-conduct discharge, confinement for 30 days, and reduction to airman. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated April 10, 1992. This Court granted review of the following issue:

> WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY INSTRUCTING THE MEMBERS NOT TO REGARD THE ADMISSIONS MADE BY THE PROSECUTION'S EXPERT WITNESS ON CROSS–EXAMINATION FOR THE TRUTH OF THE MATTERS CONTAINED THEREIN.

The prosecution's case rested solely on the basis of a positive urinalysis (Pros. Ex. 7). The laboratory report regarding the urinalysis was identified and explained at length by a government expert, Dr. William Sweet.

The defense consisted of an attempt to discredit the laboratory report by extensive cross-examination of Dr. Sweet, evidence of appellant's good character, and the sworn testimony of appellant denying that he had used marijuana.

At issue are the instructions of the military judge concerning the proper use of matters developed during the defense cross-examination of Dr. Sweet. The defense cross-examination utilized two types of extrinsic sources: learned treatises discussing the pitfalls of urinalysis and quality-control reports from the laboratory. Appellant argues that Dr. Sweet made "admissions" which were diminished by the military judge's incorrect instructions.

Dr. Sweet was asked by defense counsel to comment on the writings of several experts regarding the difficulties in conducting an accurate urinalysis. The following are pertinent excerpts from defense counsel's cross-examination:

Q: Now, Dr. Dubowski has written the following, and I would like to ask whether you agree. He's written, "Unfortunately, the second major characteristic of immunochemical assays in general, in addition to their high sensitivity, is their cross-reactivity, that is their response to other sample constituents that the one antigen used to produce the antibody, . . . . This propensity, in effect; . . . can produce false positive results." Would you agree with that statement, Dr. Sweet?

A: As a statement of a generally recognized problem, yes I would agree with that statement. Whether or not—I would have to read the rest of the written material surrounding that, to see precisely what limits he was placing on that statement.

Q: But at this point, as a general statement—

A: —But as a general, broad statement, yes, that's correct. That would be a statement, I think, that could be ascribed to by most anyone in the field.

\* \* \*

Q: Okay. I'm going to read you a quotation again from Dr. Dubowski, and I'm going to ask you whether you agree with it. "No one knows how many dozens, hundreds, or thousands of other chemical compounds can or will have an identical retention time, peak shape, and end detector response if present in the sample and amenable to the extraction procedure used. Phrased differently, the identification of a presumed anti-like by typical GC

entities, such as retention time or retention index, is distinctly an assumption."
A: That's just what I said, yes. With the kind of—same kind of caveats that we've discussed in the last quotation that you read from him, yes I would agree with that.

\* \* \*

Q: Dr. Fredericks himself has written the following: "In the selective ion monitoring mode," which is the one we're talking about.
A. Yes.
Q. "Only the ion currents of a few fragments characteristic of the anilide monitor, this mode offers greater sensitivity but at the expense of specificity, because identification is based on a less specific pattern." Would you agree with that statement?
A: As far as it goes, which isn't quite far enough, yes I would agree with it.

The cross-examination then shifted to the quality-control reports. The reports were not introduced in evidence but were used to cross-examine Dr. Sweet regarding his claim of 100% accuracy. The reports reflect that a certain number of "runs" were rejected by quality-control inspectors because of technical defects in the analyses.

Defense counsel first cross-examined Dr. Sweet about a quality control report for January 1990. Counsel noted that "out of 42 runs done in January, six were marked as unacceptable" and "four were unacceptable because of unacceptable blinds." (Blinds are known samples used to test the accuracy of the testing process.) Asked what was meant by "unacceptable blinds," Dr. Sweet responded, "It means any of several things," including the possibility "that the concentration for the blinds were not in the expected range." Defense counsel asked if the blinds were unacceptable "because you were expecting a certain result and you didn't get them," and Dr. Sweet agreed.

Defense counsel then questioned Dr. Sweet about the report for February 1990, reciting that "this report states, Dr. Sweet,

that of 44 runs, five were unacceptable and were associated with an apparent problem in the extraction procedure . . . . manifested by the appearance of extraneous peaks eluting prior to the THC." Asked to comment, Dr. Sweet explained that it was a problem occurring "periodically over the last several years, in which at random intervals there are clusters of runs in which a peak appeared on the chromatogram, in addition to the THC acid peak, and eluding [sic] earlier than that THC acid peak." Dr. Sweet explained that the problem exists "in the peak recognition software" of the computer and that the computer "will then look at the retention time of that peak and see that it is not THC, not the same retention time," and erroneously conclude that "it's a different compound," because "it says that the THC is out of the allowable range, retention time, and therefore, it is not THC." Dr. Sweet testified that the problem had been investigated for several years but that its cause was unknown and "will probably come up again sometime."

Defense counsel then turned to the quality-control report for March 1990, which recited "that on 32 runs, confirmations for THC, three were unacceptable because of chromatography." He asked Dr. Sweet to define "poor chromatography." Dr. Sweet defined it as "[e]ssentially, peak shapes that are not idealized bell shape curves," due to "multiple causes that are not clearly understood." Asked if some urine samples do not test well by chromatography, Dr. Sweet replied:

That is correct. Occasionally a urine has been declared presumptive positive by RIA, but acceptable chromatography could not be achieved on that urine, and it is reported out as unfit for testing.

Asked to explain why "acceptable chromatogrophy" cannot be achieved, Dr. Sweet responded:

It's unknown basically. There are speculations and hypotheses, but there is not an adequate level of proof to say with any degree of assurance that this is the cause or these two things are the most probable causes.

Defense counsel then turned to a memorandum for record dated April 1990 and questioned Dr. Sweet about "an RIA screen that failed because of negative QC blinds, actually produced a positive result." Asked to explain, Dr. Sweet testified:

As we discussed yesterday, with this centrifugation technique, a glob in the bottom of the tube is centrifuged out and the overlying aqueous layer is poured off.

\* \* \*

This is a sticky substance and a large fraction of the time, well over 99 percent of the time, the entire pellet stays there. There is a possibility that the whole pellet or a fragment thereof will become detached and wash out, carrying its radioactivity with it, the count will then go down and it will be recorded as a positive. This is always a possibility in anytime that one does the immunoassay.... The standard procedure is blinded out for any reason, including thoroughly explainable reasons. The whole batch is reanalyzed from fresh aliquots.

Defense counsel concluded his cross-examination by focusing on Dr. Sweet's claim of 100% accuracy, questioning Dr. Sweet as follows:

Q: Okay. Now, let's work this out. Your definition of a false positive is a report that says positive coming from the lab, when in fact there is no drug present in the urine?

A: That is correct. No drug present above the cutoff level.

Q: Okay. No drug present above the cutoff level, present in the urine. Now, to back this up, you have stated that there are number of internal and external controls.

A: Yes.

Q: But all we can really say, Dr. Sweet, is that those internal and external controls have all been reported correctly, isn't that right?

A: No, that's not all that one can say. One can say that with certainty. One can also say that the samples are tested three different times on three different aliquots, by two different methods, and that they are all coincident, that they all produce the same conclusion. So, one has more evidence than simply some blind quality controls from external agencies.

Immediately after the cross-examination of Dr. Sweet was completed, the military judge instructed the court members as follows:

Mr. President, members of the court, during the cross-examination, various statements were read by counsel to the witness. Those statements were admitted solely for the purpose of testing the testimony of this witness. You may not consider those statements for the truth of the matter contained in the statement. Likewise, certain exhibits were shown, but not offered nor admitted. Again, for the purpose of testing the testimony of this witness. Similarly, you may not consider those documents for the truth of the matter contained in those documents. Do you have any questions about my instruction?

A court member then inquired:

Just to be sure that I understand. In other words, if Dr. Sweet—if the statements were read to Dr. Sweet and he said the 'A' is true, I cannot assume that 'A' is true?

The military judge responded:

That is correct. It's offered to test or explain or expound on the testimony of this witness, but you may not consider the statements or the documents for the truth of the matter contained therein.

On redirect, Dr. Sweet testified that none of the problems mentioned in the quality-control reports were experienced in this case. Dr. Sweet concluded by explaining the significance of the quality-control reports as follows:

Q: First, let me ask you, it is uncommon or is the fact these were reported out of standard surprise you or strike you as—does it cause concern to you?

A: It does not cause a level of concern that would be about the testing process in general. If this kind of thing were to

happen with high frequency, *it would be more a cause for budgetary concerns, because the batches, screen or otherwise, have to be redone every time that a quality control does not work.* It is relatively uncommon, but it certainly occurs with regularity.

Q: Now, without going back through the bad chromatography or extraction or discussing anything further, let me ask you this. Would any of the matters raised in those monthly reports you talked about cause a false positive to be reported?

A: No.

(Emphasis added.)

In response to a court member's question about the possibility of a laboratory technician with an "ax to grind" injecting "an illegal substance" into a urine sample, Dr. Sweet responded that it would be "[h]ighly unlikely" because each sample is tested three times by three different technicians and all three sets of tests, both screening and confirmatory, must be positive for the same to be reported positive.

Appellant argues that the military judge's instruction erroneously required the court members to disregard Dr. Sweet's "admissions" regarding the opinions of other experts and the errors in the testing process. On the other hand, the Government argues that Dr. Sweet did not adopt the matters referred to in cross-examination; but that, even if he did adopt them, the same evidence was presented to the court members by other means.

■ A "military judge should give a limiting instruction" when hearsay evidence is used on cross-examination to test an expert's opinion. *United States v. Neeley,* 25 MJ 105, 107 (CMA 1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988); Mil.R.Evid. 703, Drafters' Analysis, Manual for Courts–Martial, United States, 1984, at A22–46 (Change 3).

The purpose of such an instruction is to prevent a party from "smuggl[ing]" inadmissible hearsay into the trial by referring to it in cross-examination. 25 MJ at 107.

In this case the military judge's instruction that the court members may not "assume" a fact to be true because the expert says it is true was technically correct. Court members must determine the facts, not assume them.

■ Regarding the learned treatises referred to on cross-examination, Dr. Sweet agreed with the writings of Dr. Dubowski and Dr. Fredericks regarding the pitfalls of drug testing. Those writings were not excludable as hearsay but were admissible as part of Dr. Sweet's expert testimony. *See* Mil.R.Evid. 803(18) (learned treatises called to attention of expert or relied upon by expert not excluded by hearsay rule).* To the extent that the military judge's instruction precluded the members from considering those writings for their truth, it was erroneous.

■ Regarding the quality-control reports, much of Dr. Sweet's testimony simply defined terms such as "unacceptable blinds" and "poor chromatography." He did not testify to or adopt the statistics or conclusions in the reports, and defense counsel did not offer the reports in evidence. Therefore, the statistics and conclusions recited in the reports were hearsay and properly limited by the military judge's instruction.

Dr. Sweet did testify from his own knowledge about three facts addressed in the quality-control reports: (1) the problem involving the peak-recognition software; (2) the fact that some urine samples cannot satisfactorily be tested by chromatography; and (3) the fact that an RIA screen failed in April 1990 and was reanalyzed. To the extent that the military judge's instruction precluded the court members from consid-

---

* Mil.R.Evid. 803(18), Manual for Courts–Martial, United States, 1984, requires, as the evidentiary foundation for learned treatises, that such writings be "established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice." Trial counsel waived any deficiencies in the foundation for the learned treatises by his failure to object. Mil.R.Evid. 103(a).

ering these factual statements for their truth, it was erroneous.

Where the military judge's instruction fell short was in distinguishing among the factual assertions in the quality-control reports which Dr. Sweet merely explained but did not adopt; the factual assertions in those reports about which Dr. Sweet testified from his own knowledge; and the opinions of other experts pertaining to the pitfalls of urinalysis, which were adopted by Dr. Sweet as his own. However, since appellant did not object at trial to the military judge's limiting instruction, any errors in those instructions must constitute plain error to require reversal. *United States v. Hargrove*, 25 MJ 68 (CMA 1987), *cert. denied*, 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988); RCM 920(f), Manual, *supra*. "[T]o constitute plain error, the error must not only be both obvious and substantial, it must also have 'had an unfair prejudicial impact on the jury's deliberations.'" *United States v. Fisher*, 21 MJ 327, 328 (CMA 1986); *see United States v. Olano*, —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Further, the plain-error doctrine is reserved for "those circumstances in which a miscarriage of justice would otherwise result." *United States v. Fisher*, *supra* at 328–29.

We hold that the deficiencies in the military judge's limiting instructions do not rise to the level of plain error. With respect to the opinions of other experts, we regard appellant's characterization of Dr. Sweet's answers as "admissions" inapt. "Admissions" are "concessions" as to the existence of a fact favorable to an adversary. *See* Black's Law Dictionary 47 (6th ed.1990). Dr. Sweet did not waver in his assertions regarding the accuracy of urinalysis in his laboratory. At most, the learned treatises expound on the difficulty of conducting an accurate urinalysis, a proposition which no one disputed.

As to the quality-control reports, Dr. Sweet did not concede most of the facts asserted but merely explained the terms and explained how such discrepancies could occur. All that Dr. Sweet admitted was that some batches had to be retested because the quality-control systems showed that those particular tests might be unreliable. In other words, the quality-control systems worked. His assertion of 100% accuracy in reporting was unshaken by the cross-examination. In the vernacular, "They never laid a glove on him."

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and WISS concur.